David D. WOODS, Florence L. Woods, Kristine Woods and Benjamin Woods, d/b/a Callicoon Music, Plaintiffs,

v.

BOURNE CO. and American Society of Composers, Authors and Publishers, Defendants.

No. 89 Civ. 3641 (RO).

United States District Court, S.D. New York.

Jan. 10, 1994.

Deutsch Klagsbrun & Blasband, New York City (David Blasband, Frederick F. Greenman, of counsel), for plaintiffs.

Abeles Clark Osterberg and Prager, New York City (Robert C. Osterberg, of counsel), for defendant Bourne Co.

Bernard Korman, New York City, for defendant American Soc. of Composers, Authors and Publishers.

AMENDED OPINION

OWEN, District Judge.

This action, tried before me without a jury, involves the 1926 hit song "When the Red, Red Robin Comes Bob–Bob–Bobbin' Along", and seeks a declaratory judgment as to who is entitled to 1) certain ASCAP[1] perfor-

---

1. ASCAP, the American Society of Composers, Authors and Publishers, is a performing rights licensing organization composed of composers, lyricists and music publishers. A membership association, it licenses the non-exclusive right to such as TV and radio stations and movie theaters to perform publicly all copyrighted musical works of its members, which gives the licensee the right to use any and all of the works of any and all of its thousands of members as often as the license holder wants. From the fees collected from these performance facilities, ASCAP dis-

mance royalties[2] and 2) certain royalties from printed scores during the nineteen-year extension of copyright protection Congress provided in 1976 for a song in its copyright category.[3] This requires the Court to define a "derivative" musical work, and specifically a song[4] under the 1976 Copyright Law amendments,[5] which is determinative of the issue.

The plaintiffs are the statutory heirs of the composer/lyricist Harry Woods. Defendant Bourne Co. is the publisher of the song, successor to Irving Berlin, Inc., the original publisher in 1926. ASCAP, as a stakeholder, is a nominal defendant.

The background against which the issues must be viewed is as follows. Prior to 1976, a composer of a song was entitled to a maximum term of copyright protection of 56 years consisting of an initial twenty-eight year period with the right to renew for a second twenty-eight years. As to a song then in its renewal period, the Copyright Law amendments of 1976 gave that song a further term of nineteen years of copyright protection (for a total of seventy-five years) with the right to the composer to terminate any agreement with any publisher effective at the end of the fifty-six years, and thereby retake, keep or further exploit all rights in the song as the composer might wish during the additional nineteen years of copyright protection. This was designed to provide additional reward solely to the composer for his or her creativity and to relieve a composer from an ill-advised publishing contract made before a successful piece of music had so demonstrated itself.[6]

Certain exceptions did, however, have to be made to a composer's complete recapture of copyright rights before the nineteen-year extension began. These exceptions were dictated by the nature of the recording, radio, TV, and film industries and their earlier contractually-authorized uses of the composer's work, as well as earlier authorized original creative additions to the material such as by third-party composers and orchestrators. To this end, the statute provides "derivative work" exceptions.[7]

Accordingly, where during the pre–1976 original fifty-six year term of a copyright the work had found its way onto a phonograph record (or cassette or CD), or had been used in a movie, or television show, or had been creatively and with originality rescored for performance by another composer, while the nineteen year extension of copyright rights reverts to the original composer, the statute permits the creator of the "derivative work" as defined, (recording company, film maker, or novel rescorer), the right to continue exploitation of such derivative work during the extension in accordance with the terms of the original grant to such creator. Without this, the writer of the song, upon reversion, could arguably prevent the derivative work from being used at all or demand exorbitant royalties whereas the owner of rights in the derivative work had, conversely, at the time of contracting, the expectation that at the end of 56 years, the song would be free from copyright and in the public domain.

Next, necessary to an understanding of the relatively narrow focus of this case, are the following facts. In order for a song, once written, to get to the public's ears by way of radio, movies, or TV drama,[8] there are basically two levels involved, each with different publishing and/or licensing agreements, payment methods, and channels to get fees to

tributes all income above operating costs to its members.

**2.** ASCAP has been holding the funds in escrow (now somewhat well in excess of $100,000) awaiting the outcome of this litigation.

**3.** 17 U.S.C. 304(b).

**4.** Both in performance and as printed.

**5.** 17 U.S.C. § 304(c)(6)(A).

**6.** No publisher suffered by this since at the time of contracting with the composer at the outset, no publisher expected more than at most a 56 years' framework within which to obtain its compensation. No publisher had an expectation of the additional nineteen years now granted to the composer.

**7.** See p. 121 *infra*.

**8.** There are variations within all these uses, which, however, are not material to the issue before the court in this action.

the publisher and/or composer for the use of the composer's product. Thus, at the first level, to put a song on a record (or on CD) or put it on a movie or TV drama sound track, the recording company, or movie maker or TV producer obtains from the song's publisher the right just to make and sell [9] the record or just to put the song on the sound track.[10] None of the foregoing, however, authorizes public performance of the song, which is the second level. Thus, a radio station disk jockey cannot broadcast the recording unless that radio station has a license from a performing rights organization covering that composer and publisher (in this case, AS-CAP).[11] Similarly, the TV station airing the drama must be licensed by ASCAP and, with certain possible exceptions subsequent to 1948 not relevant here, so must a movie theater exhibiting the film.[12] ASCAP then distributes to its member composers and publishers the royalties received from these licensees in accordance with its (ASCAP's) survey of performances of the various pieces in its catalogue during the given period.

Accordingly while during the said nineteen-year extension of the copyright life of the song, a record, CD or film being by definition a "derivative work", such may continue to be sold or exhibited under the terms of the original license with the publisher. However, it is here that the question of whether the music itself is "derivative" becomes crucial. If the version of the music is "derivative," then as to the public performance of the music, the derivative composer's agreement with—license from—the publisher survives for the nineteen-year extension, and ASCAP is to pay the publisher's share to the publisher with such further distribution thereafter, as the contract between the publisher and the composer provides, *Mills Music v. Snyder,* 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985).[13] However, if the version of the song used on the record or in the film is not a "derivative work", i.e., it is basically the original composer's original song, then, the publisher's rights thereto having reverted to the composer, ASCAP is to pay royalties for the public performance of any non-derivative version to the composer, or his heirs or assigns during the nineteen-year extension.

◼ Against the foregoing background, the issue the parties tried before me was obviously, "What is a derivative work?" Composer Woods' heirs contend that it means the original "Red, Red, Robin" with such novel, original and creative additions to or variations of its basic music and/or lyrics as to entitle the additions and/or variations to their own copyright protection.

Defendant Bourne, on the other hand contends that everything it ever published is derivative. It premises this on the fact that since its predecessor Irving Berlin, Inc. was given but a "lead sheet" by composer Harry Woods in 1926, that is, just the melodic line with the lyrics written under it, everything that it published thereafter was a "musical arrangement" under 17 U.S.C. § 101, and therefore a "derivative work". This, Bourne argues, includes even the original piano and voice version prepared for sale to the public in 1926 by Irving Berlin, Inc. I find Bourne's position [14] to be wholly contrary to

---

9. For non-public performance.

10. Called a synchronization right, or "sync" right.

11. ASCAP's license to these performing organizations is generally a blanket license allowing the use of ASCAP's entire catalogue for a single tailored fee.

12. In the event the performing organization has no license from ASCAP, it must get the specific right to perform the music publicly from the composer or publisher as the case may be.

13. Under this ruling Bourne continues to receive the income from the sales of records.

14. Bourne Trial Brief at p. 4 clearly articulates this position in arguing the burden of proof issue:

Who has the burden of showing whether the basic words and music of the lead sheet edition of the Song, a post-termination derivative work or a Bourne Derivative Work, was used in each performance generating the royalties payable by ASCAP?

\* \* \* \* \* \*

Bourne submits that the burden of proof should be on plaintiffs to show that only the basic words and music of the lead sheet edition of the song or post-termination derivative works were used in the Unidentified Performances.

common sense and the realities of the trade. The applicable statute, 17 U.S.C. § 101, reads in relevant part:

> A "derivative work" is a work based upon one or more preexisting works, such as a ... musical arrangement, ... motion picture version, sound recording, ... or any other form in which a work may be recast, transformed, or adapted ... A work consisting of ... modifications which, as a whole, represent an original work of authorship is a "derivative work".

This, for present purposes, must also be read in conjunction with § 103(a) and (b), which read as follows:

> (a) The subject matter of copyright ... includes ... derivative works, ....
>
> .    .    .    .    .
>
> (b) The copyright in a ... derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work ...

I reject Bourne's definition of "derivative work" as being anything beyond the lead sheet. Those words, "musical arrangement", cannot be read in a vacuum. They must be read together with the second sentence of § 101 which requires the "modification" to the composition to be an original work of authorship, and together with the entitlement to copyright which is set forth in § 103.[15]

Further, Bourne's contention that the piano and voice version Irving Berlin, Inc. made from Woods' lead sheet is a "derivative work" since all Woods supplied it was the melody line and the words, is contrary to the ways of the trade. The lead sheet could *not* be sold to the public as a piece of sheet music.[16] Perhaps a piano arranger for a few dollars did make a piano version which could be sold to the public. But Bourne's claim that Berlin thereby provided harmonies under the melody, is also contrary to the ways of the trade. Woods' name is not only on the piano-vocal score as its sole creator, but he doubtless played the song for Berlin when he brought it into the firm, and he certainly had to have checked and approved what Bourne put out on the market for the public to buy as *his* song. It is inconceivable that Woods would have let it go out for sale without assuring himself of this.

▮▮▮ Accordingly, the very first piano and voice version that was sold could not possibly be a "musical arrangement" making it a "derivative work" of the lead sheet.[17] In order therefore to qualify as a musically "derivative work", there must be present more than mere cocktail pianist variations of the piece that are standard fare in the music trade by any competent musician.[18] There must be such things as unusual vocal treatment, additional lyrics of consequence, unusual altered harmonies, novel sequential uses of themes—something of substance added making the piece to some extent a new work with the old song embedded in it but from which the new has developed. It is not merely a stylized version of the original song where a major artist may take liberties with the lyrics or the tempo, the listener hearing basically the original tune.[19] It is, in short, the addition of such new material as would entitle the creator to a copyright on the new material.

---

15. It appears that Bourne years ago raised the same "musical arrangement" argument in *Bourne Co. v. MPL Communications*, 675 F.Supp. 859 (S.D.N.Y.1987), before Judge Sprizzo who rejected it in fn. 8 on p. 864.

16. But it could be sent to the copyright office to register the copyright.

17. Bourne makes a similar claim as to the 1981 piano and voice version which it caused to be published through Hal Leonard Co. This has a bass line modestly tailored to fall better on the ears of the time. This, however, in no way, qualifies it for "derivative" status. See *infra*.

18. See p. 122, infra.

19. If performance variations by artists created a "derivative work", that was copyrightable,

> We would have to hold that Mr. Charles Laughton, for instance, could claim the right to forbid anyone else from imitating his creative mannerisms in his famous characterization of Henry VIII, or Sir Laurence Olivier could prohibit anyone else from adopting some of the innovations which he brought to the performance of Hamlet.

*Supreme Records v. Decca Records*, 90 F.Supp. 904, 909 (S.D.Cal.1950).

The foregoing reasoning is, I conclude, consistent with not only the Congressional language under the amended copyright law, supra, but also the musical realities of the industry, and has been so viewed by the various courts that have considered this issue as far back as Mr. Justice Nelson in *Jollie v. Jacques, et al.,* Fed.Cas. No. 7,437 (C.C.S.D.N.Y.1850) where he stated:

> The musical composition contemplated by the statute must, doubtless, be substantially a new and original work, and not a copy of a piece already produced, with additions and variations, which a writer of music with experience and skill might readily make.

Judge Learned Hand, then a District Judge, in *Fred Fisher, Inc. v. Dillingham,* 298 F. 145 (S.D.N.Y.1924) was succinct at 148:

> There is a minimum of change which the law will disregard.[20]

In *Cooper v. James, MD,* 213 F. 871, 873 (D.Ga.1914), the District Court held:

> [T]he important fact being that the altos to these tunes are mere improvements, by adding another part to well-known, old-fashioned tunes, to which no one, so far as the tunes are concerned, claims or can claim to have any special rights whatever.
>
> \*    \*    \*    \*    \*    \*
>
> [I]n music it may be said that anything which a fairly good musician can make, the same old tune being preserved, could not be the subject of a copyright.

In *McIntyre v. Double–A Music Corp.,* 166 F.Supp. 681 (D.Cal.1958), the court stated in the same vein:

> All this involved was the addition of certain inconsequential melodic and harmonic embellishments such as are frequently improvised by any competent musician. One expert testified that the introduction added by plaintiff was as commonplace among musicians as the fairy story beginning, "Once upon a time." These same bars and developments thereof were repeated throughout the song as breaks and as an ending. Such technical improvisations which are in the common vocabu-

lary of music and which are made every day by singers and other performers, are de minimis contributions and do not qualify for copyright protection.

In more recent times in *Picture Music, Inc. v. Bourne, Inc.,* 314 F.Supp. 640 (S.D.N.Y. 1970), aff'd 457 F.2d 1213 (2d Cir.) cert. denied 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972). The Court, finding no copyrightability in the new material, stated at 652:

> The music used in the song was actually taken from the music in the picture but placed in different positions; the basic music in the song is not different.

In *Norden v. Oliver Ditson Co.,* 13 F.Supp. 415 (D.Mass.1936) the Court stated:

> But a composition, to be the subject of a copyright, must have sufficient originality to make it a new work rather than a copy of the old, with minor changes which any skilled musician might make. It must be the result of some original or creative work.

In *Shapiro Bernstein & Co. v. Jerry Vogel Music Co.,* 73 F.Supp. 165 (S.D.N.Y.1947), the Court stated at 167:

> The change in time of the added chorus, and the slight variation in the bass of the accompaniment, there being no change in the tune or lyrics, would not be "new work".

Having so defined a "derivative" piece of music under § 101, and since in the nineteen-year extension of copyright, Bourne is only entitled to receive post-termination ASCAP performance royalties for derivative works authorized *before* termination, the question on this record is whether there is evidence establishing such performances.

■ Bourne, seeking to avail itself of the "derivative works" exception has the burden of proving that the exception applies. *United States v. Allen,* 163 U.S. 499, 16 S.Ct. 1071, 41 L.Ed. 242 (1896). On this record, I conclude that it is unable to do so as to any

---

**20.** A contrary rule would "lead[ ] to endless hairsplitting copyright litigation." *Moore Publishing Inc. v. Big Sky Marketing, Inc.,* 756 F.Supp. 1371, 1375 (D.Idaho 1991).

performances monitored by ASCAP.[21] Of the seven renditions of "Red, Red, Robin" which Bourne submitted to the Court, including such versions as those by Doris Day, Frankie Carle, Dean Martin and Al Jolson only one, the Fred Waring version is arguably a "derivative work."[22] But ASCAP's monitoring records in most instances do not record the version of the work that is monitored but merely that the fact that the song has been monitored. The Waring version does not appear in any ASCAP survey before me, and I am not told when or where the Waring version given me by Bourne on a cassette was taped, whether before or after termination. Thus, I cannot tell whether it generated any royalties in the nineteen-year extension period or not.

Bourne, recognizing the fact that ASCAP's records do not assist in meeting its burden of proof, suggests that the burden should be on plaintiffs. This is, however, too slender a reed on which to base a departure from such a basic principle. It is at most, a matter between ASCAP and its members (of which Bourne is one) for future discussion.

Plaintiff's second claim is for the royalties Bourne received from the post-termination Hal Leonard printed versions. The same law applying, I find nothing in any printed version published by Leonard which, in my view, comes close to being a "derivative work" as defined. Even the defendant's expert, Dr. Howard Cass, declined a flat-out assertion that any such printed versions in this record are "derivative works."[23]

The 1981 Bourne piano-vocal version with a moving bass line as opposed to the version published in 1926, in no way exhibits the degree of creativity required to make it a derivative work. See *Shapiro Bernstein & Co. v. Jerry Vogel Music Co.,* supra.

In sum, on this record there is no showing that any ASCAP performance royalties so far during the nineteen-year extension are for pre-termination Bourne-authorized derivative works. Nor are the Hal Leonard printed scores "derivative works", let alone based on pre-termination "derivative works". Accordingly, I award judgment to the plaintiffs as follows: ASCAP is to pay its accumulated performance royalties to the plaintiffs, the heirs of the composer/lyricist, and Bourne is to remit to the plaintiffs all income that it has received from any post-termination sale of printed scores by Hal Leonard. The foregoing constitutes the Court's findings of fact and conclusions of law. A formal judgment is to be submitted on notice.

---

21. Since ASCAP only does a sampling, there is no information before me of any kind beyond the sampling.

22. The Delta Faucets commercial which produced substantial performance royalties is basically no more than a splicing of snippets of non-derivative portions of "Red, Red, Robin".

23. On this issue, Dr. Cass responded to questions from the Court as follows:

Q. What is it that you want me to deduce ... from that bass line?

A. All I am stating is whoever arranged this made a decision to add this based on their aesthetic values, and that it is a creative addition to the piece.

Q. You feel that is of such creativity as to make it a derivative work?

A. In terms of a legal definition of what a derivative work is, I am not anxious to get into that. In terms of what I conclude is creative addition, I believe that the material added, the arrangement on whole, yes.