David D. WOODS, Florence L. Woods, Kristine Woods and Benjamin Woods, d/b/a Callicoon Music, Plaintiffs–Appellees,

v.

BOURNE CO., Defendant–Appellant,

American Society of Composers, Authors and Publishers, Defendant.

No. 571, Docket 94–7421.

United States Court of Appeals, Second Circuit.

Argued Feb. 3, 1995.

Decided July 25, 1995.

Robert C. Osterberg, New York City (Abeles Clark Osterberg and Prager, of counsel), for defendant-appellant.

Frederick F. Greenman, New York City (Deutsch Klagsbrun & Blasband, Alvin Deutsch, David Blasband, of counsel), for plaintiffs-appellees.

Before: FEINBERG, CARDAMONE and McLAUGHLIN, Circuit Judges.

FEINBERG, Circuit Judge:

This appeal requires us to address conflicting claims to royalties generated by various uses of the song "When the Red, Red, Robin Comes Bob, Bob, Bobbin' Along" (the Song) during what is known in copyright law as an extended renewal term. Plaintiffs, heirs of song composer Harry Woods, and defendant Bourne Co., Woods's music publisher, both claim the right to receive certain royalties generated during this period. Essentially, plaintiffs claim that they are entitled to the royalties because they have exercised their statutory right to terminate the publisher's interests in the Song pursuant to 17 U.S.C. § 304(c). Bourne maintains that the royalties belong to it because all the disputed post-termination uses of the Song are attributable to so-called derivative works, which were prepared under its authority prior to termination and which therefore do not revert to the author. 17 U.S.C. § 304(c)(6)(A).

The royalties at issue were generated by several different uses of the Song following termination. These uses include (1) television performances of movies and television programs that incorporate the Song (hereafter sometimes referred to collectively as "audiovisual works"); (2) radio performances of sound recordings of the Song; and (3) sales of reprints of published arrangements. Following a bench trial before Judge Richard Owen in the United States District Court for the Southern District of New York, judgment was entered in March 1994 granting all the disputed royalties to plaintiffs-appellees. The opinion of the district court is reported at 841 F.Supp. 118.

The district court essentially reached its determination by analyzing whether any of the musical arrangements of the Song contained in the movies, television shows, sound recordings and printed arrangements were sufficiently original to qualify as derivative works. Finding that, with one minor exception, no version of the Song was sufficiently original, the district court granted judgment for the plaintiffs. The district court did not consider it relevant that some of the disputed royalties were generated by performances of audiovisual works, such as movies containing the Song, which are conceded to be original enough to qualify as derivative works.

For reasons set forth below, we hold that when a musical arrangement is contained within an audiovisual work produced under license from a publisher prior to termination, the publisher is entitled to receive royalties from post-termination performances of the audiovisual work under the terms of pre-termination licenses governing performance rights. It is irrelevant to disposition of those royalties whether the musical arrangement in the audiovisual work would qualify independently as a derivative work. We reverse the ruling of the district court in this respect and direct payment of royalties to Bourne for these performances in accordance with the terms of the licenses governing performance of the Song immediately prior to termination.

Whether a particular musical arrangement prepared under the authority of the publisher is a derivative work is relevant, however, to most other disputed categories of royalties before us. We essentially affirm the judgment with respect to those categories. For reasons set forth below, we affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

## I. Background

### A. The Grant

Harry Woods (Woods) wrote the words and music to "When The Red, Red, Robin Comes Bob, Bob, Bobbin' Along" in 1926. That same year, Woods entered into a Songwriter's Agreement with the publishing company of Irving Berlin, Inc. (Berlin). The heirs of Woods, doing business as Callicoon Music (Callicoon), are plaintiffs-appellees in this matter. At some point in the 1940s, the Bourne Company (Bourne), defendant-appellant herein, succeeded to Berlin's interests in the Song.

By the Songwriter's Agreement, Woods transferred to Berlin

the original musical composition ... including the publishing rights, the performing rights, the rights to use the same for mechanical reproduction, the right to

make, publish and perform any arrangement or adaptation of the same, and all copyrights and the rights to secure copyrights and extensions and renewals of copyrights in the same, or in any arrangements or adaptations thereof.

In April 1926, Berlin obtained a certificate of registration of copyright for the original unpublished musical composition. The copyright certificate indicates that Woods is the author of the words and music. Berlin also published a piano-vocal arrangement, and Berlin obtained a certificate of copyright for that arrangement one month after registering the unpublished Song. The copyright certificate for the piano-vocal arrangement also names Woods as the author of the words and music. Berlin is listed as the copyright owner on both certificates. The certificates do not indicate that anyone other than Woods acted as arranger.

### B. The Extended Renewal Term

Under the Copyright Act of 1909, in effect at the time of Woods's grant to Berlin, the original term of a copyright was 28 years, followed by a renewal term of another 28 years. Pub.L. No. 349, 35 Stat. 1075, § 23 (1909). Thus, the grant from Woods to Berlin in the Songwriter's Agreement, which included renewal rights, was to endure for up to 56 years, ending in 1982.

The reason for including a renewal term in the Copyright Act was to permit an author who sold the rights in his work for little consideration, when measured against the work's subsequent success, to enjoy a second opportunity with more bargaining power to reap the full value of the work. See 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 9.02 at 9–28 to 9–29 (1994).[1] Thus, Congress attempted to alleviate the problem of the inability of authors to know the true monetary value of their works prior to commercial exploitation. Id. at 9–30. That purpose, however, was largely eroded by a subsequent Supreme Court decision holding that renewal rights were assignable along with original term rights in a work.

*Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943); see 2 Nimmer § 9.06[B][1] at 9–108.

When the Copyright Act was thoroughly revised in 1976, Pub.L. No. 94–553, 90 Stat. 2541 (1976), Congress attempted to restore a second chance to authors or their heirs. Among other changes, Congress prolonged the duration of copyrights then in the renewal term so that they would continue for an additional 19 years. 17 U.S.C. § 304(b). At the end of the 28th year of the renewal term, the author (if alive) or the author's surviving spouse or children may terminate the rights of a grantee, usually a publisher, to whom the author had transferred rights in the original work. 17 U.S.C. § 304(c)(1)–(3). During the 19–year extended renewal term, a copyrighted work does not enter the public domain but continues to generate royalties. If the author or heirs elect to terminate the publisher's rights, royalties become payable to them rather than to the publisher. 17 U.S.C. § 304(c)(6). The author or heirs thus "recapture" rights in the copyrighted work and may thereby be relieved "of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the [work's] true value." *Mills Music, Inc. v. Snyder,* 469 U.S. 153, 172–73, 105 S.Ct. 638, 649, 83 L.Ed.2d 556 (1985).

There is an important exception to the reversion rights of the author or heirs for derivative works produced by an authorized party during the original and renewal copyright terms. The Copyright Act of 1976 provides that

[a] derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 304(c)(6)(A) (referred to hereafter as "the Derivative Works Exception" or

---

1. Cf. Pierre N. Leval & Lewis Liman, Are Copyrights for Authors or Their Children?, 39 J. Copyright Soc'y U.S.A. 1 (1991).

simply "the Exception"). The Act defines a derivative work as

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101.

The renewal term for Bourne's copyright in the Song came to an end in April 1982, and Callicoon terminated Bourne's rights immediately thereafter.

### C. Registration and Commercial Exploitation of the Song

During the original and renewal copyright terms, Berlin, and then its successor Bourne, successfully exploited the Song for its commercial value. As already noted, Berlin published a piano-vocal arrangement of the Song in 1926, shortly after receiving the grant from Woods. Berlin registered the piano-vocal arrangement with the Copyright Office, naming Woods as the author. Berlin or Bourne eventually prepared and published approximately 19 other arrangements of the Song for various combinations of voices and musical instruments. Bourne obtained 16 different registrations of copyright for different arrangements of the Song. The copyright registrations for these arrangements indicate that Woods is the author of the words and music. Other people are listed as arrangers or authors of new material. Bourne authorized the Hal Leonard Publishing Company (Leonard) to reprint arrangements of the Song in assorted sheet music compilations. Bourne also issued numerous licenses (known as mechanical licenses), often through its agent, the Harry Fox Agency, to record companies to make sound recordings of the Song as performed by popular artists. Bourne also issued licenses (known as synchronization licenses or synch licenses), frequently through the Harry Fox Agency, to motion picture and television studios to incorporate the Song in movies and in television programs.

After terminating Bourne's rights in the Song, Callicoon began to commercially exploit the Song. Bourne claims, and Callicoon does not dispute, that Callicoon licensed Leonard to reprint published arrangements of the Song formerly licensed by Bourne, simply changing the copyright notice to read "Callicoon" instead of "Bourne." When Leonard announced that it would continue to pay Bourne the royalties for these reprints, Callicoon licensed Warner Brothers Publications instead to reprint arrangements of the Song. Callicoon (or the Harry Fox Agency as Callicoon's agent) also issued synch licenses for use of the Song in various new television programs. Callicoon also granted new synch licenses, similar to an expired license originally issued by Bourne prior to termination, for use of the Song in an episode of "The Lucy Show." Further, Callicoon licensed use of the Song in a television advertisement for Delta Faucet.

### D. Performance Rights

The principal issues in this case concern rights to perform the Song publicly. Under the Copyright Act, "[t]o 'perform' a work means to recite, render, play, dance, or act it, either directly or by means of any device or process...." 17 U.S.C. § 101. As relevant here, performances include television broadcasts of the Song as captured in movies and television programs and radio broadcasts of the Song as captured in sound recordings.

The right to perform a work publicly has been described as "[o]ne of the greatest sources of revenue in the music industry." Sidney Shemel & M. William Krasilovsky, This Business of Music 196 (1990); see also 2 Nimmer § 8.19 at 8–264. However, given the ephemeral nature of performance, it is difficult for the owners of this right to monitor and enforce it. To facilitate these functions, authors and publishers early in this century established a performing rights society, the American Society of Composers, Authors and Publishers (ASCAP). Currently, two other societies, Broadcast Music, Inc.

(BMI) and the Society of European State Authors and Composers (SESAC), carry out similar functions. See generally 2 Nimmer at 8–264 to 8–273. Both Bourne and Callicoon are members of ASCAP.

By becoming members of ASCAP, authors and publishers may transfer to it the public performance rights in their works. ASCAP in turn issues licenses to radio stations, television stations, restaurants, stores and other entities that "perform" music publicly. Television stations generally obtain blanket licenses from ASCAP that entitle them to perform any musical composition in ASCAP's extensive catalogue. In exchange, the stations pay ASCAP a percentage of their annual gross receipts. Shemel & Krasilovsky, at 197.

ASCAP surveys all forms of public performance of members' musical compositions in order to determine allocation of licensing fees. As between the composer and publisher of a particular composition, ASCAP distributes half of the collected fees to each, unless the author and publisher indicate otherwise in their contract with each other. Al Kohn & Bob Kohn, The Art of Music Licensing 635–36 (1992).

During the original and renewal terms, Bourne received royalties from ASCAP for television broadcasts of movies and television programs containing the Song and radio broadcasts of the Song. A typical synch license issued by Bourne for the production of an audiovisual work required a producer to pay a flat fee but provided that any broadcast entity performing the Song as contained in the audiovisual work must obtain a performance license from ASCAP or Bourne. Thus, for each pre-recorded audiovisual work incorporating the Song, Bourne had two sources of income: royalties from the producer for the right to incorporate the Song in the audiovisual work and royalties from television stations, via ASCAP, for each performance of the Song contained in the work. Similarly, Bourne received income from both record producers and, via ASCAP, radio stations performing recordings of the Song. However, the licenses Bourne issued to the record producers do not address performance rights, as the audiovisual synch licenses do.

### E. The Parties' Dispute

Public performances of the Song as contained in movies, television programs and sound recordings continue to generate substantial royalties. Since Callicoon exercised its termination right in April 1982, Callicoon has continued to receive from ASCAP the author's 50% share of performance royalties, which share is not disputed.

What is disputed is the publisher's share of royalties for several categories of post-termination public performances of the Song. The first category concerns post-termination television broadcasts of audiovisual works produced under licenses issued by Bourne before termination. The second category concerns radio performances during the extended renewal term of the Song through sound recordings that were produced before termination under licenses issued by Bourne. Another category concerns post-termination television and radio broadcasts of the Song for which source material is not identified in ASCAP records. In a fourth category by itself is a television commercial for Delta Faucet licensed by Callicoon after termination; according to Bourne, the commercial contains a 1981 Bourne-authorized arrangement of the Song that is a derivative work.

Prior to Callicoon's termination of Bourne's rights, Bourne notified ASCAP of Bourne's contention that it " 'continued to be possessed of the right to receive income from all derivative works retained by it.' " ASCAP then deemed that a dispute existed between the parties as to rights to publisher's royalties from post-termination performances of the Song. In accordance with ASCAP policy, such royalties have been held in escrow pending resolution of the dispute. The parties have stipulated that the publisher's share of post-termination royalties withheld by ASCAP from the fourth quarter of 1982 to the first quarter of 1992 is $85,042.69. This share is comprised of the following components: (1) $27,157.78 from television performances of audiovisual works created before termination; (2) $1,058.56 from radio performances of the Song in sound record-

ings created before termination; (3) $17,-985.28 from television and radio performances for which source materials were not identified in ASCAP records; and (4) $38,-841.07 from television performances of audiovisual works created after termination (including $13,365.78 from the Delta Faucet advertisement). As of October 1, 1992, an additional $32,181 in the escrow account was attributable to accrued interest and miscellaneous special distributions.

In addition to performance royalties, the parties dispute rights to royalties from sales of reprints of published arrangements of the Song in sheet music compilations produced and distributed by Leonard and Warner Brothers during the extended renewal term.

In September 1989, Callicoon filed an amended complaint against Bourne and AS-CAP in the district court seeking principally a declaration that Callicoon is entitled to the publisher's royalties withheld by ASCAP. Callicoon also sought a determination of rights to reprint royalties. The district court held a bench trial in November 1992, and rendered its decision in January 1994. Judgment in favor of Callicoon was entered in March 1994.

### F. The Decision Below

The district court determined that Callicoon was entitled to all of the royalties generated by post-termination performances of the Song, including performances contained in pre-termination derivative audiovisual works. The court acknowledged, and the parties do not dispute, that the works in which the Song was incorporated—for example, movies—were by definition derivative. Nevertheless, the court found the controlling issue, as to all categories of performance, to be whether the underlying arrangement of the Song itself is a derivative work. Only then would performance royalties continue to go to Bourne during the extended renewal term. 841 F.Supp. at 120. The court then considered whether any of the printed or performed arrangements of the Song were derivative works. It found, first, that the original piano-vocal arrangement published

by Berlin (Bourne's predecessor in interest) was not a Berlin-created derivative work. The court then found that none of the printed or performed arrangements of the Song, with the exception of one arrangement performed by Fred Waring, could be called a derivative work. *Id.* at 123.

Since Bourne claimed an exception to the general rule in the 1976 Act permitting termination of the publisher's rights, the court placed the burden on Bourne to identify performances of derivative arrangements. Since Bourne offered no evidence of performances of the Fred Waring arrangement, the court held that all of the withheld ASCAP royalties should be paid to Callicoon. *Id.* The district court also found that none of the printed arrangements made after the piano-vocal arrangement were derivative works. Accordingly, it ordered all reprint royalties to be paid to Callicoon. *Id.*

This appeal by Bourne followed.

### II. Discussion

■ The appeal poses two principal issues. The first is the basis for determining whether a publisher is entitled to receive royalties for post-termination performances of the Song in pre-termination audiovisual works, such as movies, that are concededly derivative works.[2] As already indicated, the district court found the relevant inquiry to be whether the arrangement of the Song within a derivative work is itself a derivative work. We disagree with the district court in this respect. Whether the arrangement of the Song is itself a derivative work is not relevant to this category of royalties.

■ The derivative work status of an arrangement of the Song, however, *is* relevant to several other kinds of royalties at issue in this suit. These include royalties from performances of pre-termination sound recordings, performances of post-termination audiovisual works and sales of sheet music reprints. The second principal issue in this appeal can be broken into two parts: whether the district court invoked the correct standard for determining whether arrangements

**2.** For reasons discussed in Part B below, we address pre-termination sound recordings separately, even though sound recordings are derivative works.

of the Song are sufficiently original to be derivative works and, if so, whether the court correctly applied that standard to the facts before it.

### A. Royalties from Television Performances

■ We consider first the basis for determining entitlement to royalties from post-termination performances of the Song as contained in pre-termination movies and television programs.

■ The Derivative Works Exception preserves the right of owners of derivative works to continue to exploit their works during the extended renewal term under previously negotiated terms. Without such an exception, authors might use their reversion rights to extract prohibitive fees from owners of successful derivative works or to bring infringement actions against them. See *Mills Music*, 469 U.S. at 172–74, 105 S.Ct. at 649–50 (discussing legislative history of termination right and Derivative Works Exception); *id.* at 183–84 n. 8, 105 S.Ct. at 655 n. 8 (White, J., dissenting) (explaining that under the 1909 Act, films had been removed from public circulation during renewal periods for fear of infringement actions).

The goal of keeping derivative works in public circulation does not require that publishers rather than authors receive royalties for their use. As long as the royalties paid by a derivative work user remain unchanged, the user should be indifferent as to whether an author or publisher receives the payment. See *Mills Music*, 469 U.S. at 177, 105 S.Ct. at 652. The royalties generated during the extended renewal term will be a windfall to either authors (and their heirs) or publishers since, at the time the rights at issue were originally established, neither group expected to get royalties for more than 56 years. The question, therefore, is: Who is the beneficiary of this windfall?

#### 1. The *Mills Music* Decision

The answer, according to the decision of the Supreme Court in *Mills Music, Inc. v. Snyder*, is found in the phrase "under the terms of the grant," as used in the Derivative Works Exception. We quote its text again for convenience:

> A derivative work prepared under authority of the grant before its termination may continue to be utilized *under the terms of the grant* after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 304(c)(6)(A) (emphasis supplied); see *Mills Music*, 469 U.S. at 156, 105 S.Ct. at 641.

*Mills Music* posed circumstances similar to those of the instant case. Snyder, treated for purposes of that case as the sole author of the song "Who's Sorry Now," had assigned renewal rights in the song to a publisher, Mills, in 1940 in exchange for, among other things, a 50% share in mechanical royalties, that is, royalties from sales of copies of sound recordings.[3] Mills in turn licensed record companies to produce copies of sound recordings of the song. Upon termination of the grant from Snyder to Mills, Snyder's heirs claimed the right to 100%, rather than just 50%, of future mechanical royalties. *Harry Fox Agency, Inc. v. Mills Music, Inc.*, 543 F.Supp. 844, 850 (S.D.N.Y.1982), rev'd, 720 F.2d 733 (2d Cir.1983), rev'd sub nom. *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985). Mills claimed that the sound recordings at issue were derivative works created under the terms of the grant from Snyder to Mills and that, therefore, Mills should continue to share in mechanical royalties according to the terms of that grant. 543 F.Supp. at 850.

In the district court, Judge Edward Weinfeld held that the sound recordings produced before termination were derivative works

---

**3.** A sound recording is defined by the Copyright Act as a fixation of sounds. 17 U.S.C. § 101. This is distinct from a phonorecord, which is the tangible thing on which the sounds (other than sounds accompanying an audiovisual work) are fixed. The term "phonorecords" thus includes records and cassettes, etc. While we take note of the distinction, for simplicity we refer exclusively to "sound recordings" throughout this opinion, even where it may be technically more precise to refer to phonorecords.

and that the terms of the grant required payment of mechanical royalties to Mills. *Id.* at 852. This court reversed, holding that upon termination only the grant from Mills to the record companies remained in effect. Since the basis for Mills's retention of half the mechanical royalties was the grant from Snyder, and since that grant was now terminated, all mechanical royalties should revert to Snyder's heirs. 720 F.2d at 739.

The Supreme Court reversed. It found that the phrase "terminated grant," the last two words in the Derivative Works Exception, must refer to the original grant from author to publisher. The Court reasoned that the other two uses of the word "grant" in the single sentence of the Derivative Works Exception must logically refer to the same grant. 469 U.S. at 164–65, 105 S.Ct. at 645. The Court noted that "[t]he 1940 grant from Snyder to Mills expressly gave Mills the authority to license others to make derivative works." *Id.* at 165, 105 S.Ct. at 646. It then concluded that "a fair construction of the phrase 'under the terms of the grant' as applied to any particular licensee would necessarily encompass both the [original] grant [from author to publisher] and the individual license [to record producers] executed pursuant thereto." *Id.* at 166–67, 105 S.Ct. at 646. Because the combination of the two grants directed record companies to pay royalties to Mills, and Mills in turn to pay 50% of the amount collected to Snyder, the Court held that Mills was entitled to retain its 50% share of mechanical royalties on sales of records produced before termination but sold during the extended renewal term. *Id.* at 178, 105 S.Ct. at 652.

*Mills Music* is, of course, binding upon us.[4] *Mills Music* appears to require that where multiple levels of licenses govern use of a derivative work, the "terms of the grant" encompass the original grant from author to publisher and each subsequent grant necessary to enable the particular use at issue. See Howard B. Abrams, Who's Sorry Now?

Termination Rights and the Derivative Works Exception, 62 U.Det.L.Rev. 181, 234–35 (1985) (describing holding in *Mills Music* as "preserv[ing] the entire paper chain that defines the entire transaction"). If one of those grants requires payment of royalties by licensees to an intermediary, such as a publisher, then continued utilization of derivative works "under the terms of the grant" requires continued payments to the intermediary. See *Mills Music*, 469 U.S. at 167, 105 S.Ct. at 646. The effect of *Mills Music*, then, is to preserve during the post-termination period the panoply of contractual obligations that governed pre-termination uses of derivative works by derivative work owners or their licensees.

### 2. Applying the *Mills Music* Decision

The derivative works involved in *Mills Music* were sound recordings, and the use there was the sale of copies. The concededly derivative works we now address are audiovisual works and the use in question is public performance. We believe that the reasoning of *Mills Music* also applies in this situation.

There is no question that the owners of the copyrights in audiovisual works have the right to perform the works publicly. They typically exercise this right by licensing television stations to broadcast their works. In this case, the terms of the synch licenses issued by Bourne to the producers required the television stations performing the audiovisual works to obtain a second grant from either Bourne or ASCAP, licensing the stations to perform the Song contained in the audiovisual works. In practice, this license is always obtained from ASCAP, which then remits the publisher's share of fees to Bourne pursuant to the agreement between Bourne and ASCAP. Under our reading of *Mills Music*, the "terms of the grant" include the provisions of the grants from Bourne to ASCAP and from ASCAP to television stations. This pair of licenses is contemplated

---

4. We realize, however, that its interpretation of the legislative history of the Derivative Works Exception has been criticized. See 1 Paul Goldstein, Copyright, § 4.9.3 at 498–501 (1989); William F. Patry, Latman's The Copyright Law 113 (6th ed. 1986); Howard B. Abrams, Who's Sorry

Now? Termination Rights and the Derivative Works Exception, 62 U.Det.L.Rev. 181, 224–32, 238–39 (1985); Jessica D. Litman, Copyright, Compromise, and Legislative History, 72 Cornell L.Rev. 857, 901–02 (1987). But see 3 Nimmer, § 11.02[B] at 11–18.11 to 11–18.14.

in the grant of the synch licenses from Bourne to film and television producers.

Callicoon contends that neither the terms of the grants from Bourne to audiovisual work producers nor the terms of the grant from Bourne to ASCAP identify Bourne as the payee of performance royalties. By contrast, Callicoon points out that the mechanical licenses to record companies in *Mills Music* explicitly named Mills as payee, and the Supreme Court viewed this fact as dispositive. Therefore, Callicoon argues, termination in this case "simply subjects distribution of the royalties to ASCAP's usual procedures, under which, absent any specific direction to the contrary, royalties are distributed to current copyright owners."

We do not agree. The fact that the performance right in the Song is conveyed separately through ASCAP is simply an accommodation dictated by the practical problem of enforcing performance rights and should not control analysis of the distribution of performance royalties. It may be true that no license specifically identifying audiovisual works containing "Red, Red, Robin" requires payment of performance royalties to Bourne. However, as explained above, performance royalties are generally traded "in bulk," with a publisher granting ASCAP non-exclusive performance rights in all of its songs, whether contained in derivative works or not. Television broadcast stations in turn obtain blanket licenses from ASCAP. Thus, even if the terms of a grant to perform any single work may be somewhat obscured by the bulk trading of performance rights, the terms are necessarily contained within the overarching grants (from Bourne to ASCAP and from ASCAP to the television broadcast stations) and may be reconstructed by reference to them. The relevant terms, according to *Mills Music,* would be those that were in place "at the time of termination." 469 U.S. at 174, 105 S.Ct. at 650.

We therefore reverse the decision of the district court as to royalties from post-termination performances of pre-termination audiovisual works. On remand, the court should enter judgment ordering defendant ASCAP to pay these royalties to Bourne in accordance with the terms of the grants in effect immediately prior to the effective date of Callicoon's termination.

**B.  Royalties from Sound Recordings and Other Works**

The analysis in Part A above, which applies to post-termination performances of pre-termination movies and television programs, does not apply to certain other post-termination uses of the Song. The various post-termination uses which we now consider have little in common except that for each, the question whether the arrangement of the Song itself is a derivative work is relevant to the allocation of post-termination royalties.

■ The first category to which we turn is post-termination radio performances of pre-termination sound recordings. At first blush, it may seem anomalous that sound recordings should be subject to a different analysis than the audiovisual works considered above. Like audiovisual works, sound recordings are clearly derivative works, which at least for some purposes fall within the Derivative Works Exception. See generally *Mills Music,* 469 U.S. 153, 105 S.Ct. 638 (addressing sales of copies of sound recordings). However, while the Act confers a right of public performance on the owner of a copyright in an audiovisual work, it specifically denies such a right to the owner of a copyright in a sound recording. 17 U.S.C. § 114(a); see generally *Agee v. Paramount Communications, Inc.,* 59 F.3d 317, 321 (2d Cir.1995). Instead, the right to perform a song contained in a sound recording belongs to the owner of the copyright in the song. 17 U.S.C. § 106(4); see Abrams at 235.

■ The Derivative Works Exception provides for continued utilization of a derivative work. As the Supreme Court noted in *Mills Music,* "The purpose of the Exception was 'to preserve *the right of the owner of a derivative work to exploit it,* notwithstanding reversion.'" 469 U.S. at 173, 105 S.Ct. at 650 (quoting statement of Barbara Ringer in Further Discussions and Comments on Preliminary Draft for Revised U.S. Copyright Law 39, 88th Cong., 2d Sess., Copyright Law Revision, Part 4 (H.Judiciary Comm.Print 1964)) (emphasis supplied). Thus, the Ex-

ception protects only authorized uses made by derivative work copyright owners, or their licensees.

■ Therefore, even though a sound recording is concededly a derivative work, that fact alone does not justify application of the Derivative Works Exception to performances of sound recordings—as it did with the performances of audiovisual works discussed in Part A above. We must still consider, however, whether a different analysis requires application of the Exception. Since the owner of the copyright in the Song holds the public performance right for sound recordings, that right would ordinarily revert to Callicoon during the extended renewal term. However, if the particular Song arrangements contained in the sound recordings are themselves Bourne-authorized derivative works, as Bourne contends, then Bourne should retain the performance right under the Derivative Works Exception and receive the royalties therefrom.

The same analysis applies to the royalties from the remaining post-termination uses of the Song, since Bourne argues with respect to all of them that they utilize arrangements of the Song that are Bourne-authorized derivative works. These categories of uses are the reprinting and selling of sheet music of pre-termination arrangements, the performance of a television commercial for Delta Faucet, which was produced after termination, and post-termination radio and television performances for which ASCAP records do not identify source material.

In the district court and again on appeal, Bourne has argued that all of the pre-termination arrangements prepared under its authority qualify as derivative works. This argument stems from the premise that the first published piano-vocal arrangement of the Song was itself a Bourne-authorized derivative work. The original grant from Woods to Berlin, according to Bourne, was just a "lead sheet"—a very simple, handwritten rendering of the lyrics and melody of the composition without harmonies or other embellishments. Bourne argues that Berlin modified the lead sheet by adding harmonies and other elements to create a commercially exploitable piano-vocal arrangement that

qualifies as a derivative work. Bourne also argues that the 1981 arrangement allegedly used in the Delta Faucet commercial, as well as all other Bourne-authorized arrangements, were derivative works. Because only the first piano-vocal arrangement, the 1981 arrangement and other Bourne-authorized arrangements were ever commercially exploited, Bourne concludes that any given performance of the Song is "more likely than not" a performance of a Bourne-authorized derivative work.

The district court rejected both aspects of this argument—that the piano-vocal or any other Bourne-authorized arrangements were derivative works and that all relevant performances were in fact performances of Bourne-authorized arrangements. In finding that the piano-vocal arrangement is not a derivative work, the court relied on a close reading of the statutory definition of a derivative work and inferences regarding industry practice. 841 F.Supp. at 121. For convenience, we repeat the Copyright Act's definition of a derivative work as

a work based upon one or more preexisting works, such as a ... musical arrangement ... motion picture version, sound recording ... or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101.

The district court found that the first sentence of that definition, which plainly identifies a "musical arrangement" as one type of derivative work, must be read in conjunction with the second sentence's requirement of "modifications which, as a whole, represent an original work of authorship." 841 F.Supp. at 121. Therefore, according to the district court, not every musical arrangement is entitled to derivative work status. The arrangement must be an original work of authorship. The court then asserted that Bourne's claim that Berlin's arrangers somehow exercised authorship by turning the lead sheet into a commercially exploitable piano-vocal arrangement was "contrary to the ways of the

trade." *Id.* The court inferred that Woods "doubtless played the song for Berlin when he brought it into the firm," *id.*, and that, at the very least, he must have approved the piano-vocal arrangement before it was published and made available to the public. The court concluded that, "[a]ccordingly, the very first piano and voice version that was sold could not possibly be a 'musical arrangement' making it a 'derivative work' of the lead sheet." Id. The court went on to find that none of the printed or (with one minor exception) performed arrangements were derivative works. *Id.* at 122–23.

### 1. The Standard of Originality

■ In order for a work to qualify as a derivative work it must be independently copyrightable. *Weissmann v. Freeman,* 868 F.2d 1313, 1320–21 (2d Cir.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989). The basis for copyright protection contained in both the constitution and the Copyright Act is originality of authorship. *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486, 490 (2d Cir.) (in banc), cert. denied, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). While a certificate of copyright registration, such as the one that Berlin obtained for the piano-vocal arrangement, creates a presumption of copyrightability, the existence of a registration certificate is not dispositive. *Weissmann,* 868 F.2d at 1320.

■ We thoroughly discussed the standard of originality in a derivative work in our in banc decision in *Batlin.* There we held that "there must be at least some substantial variation [from the underlying work], not merely a trivial variation." *Batlin,* 536 F.2d at 491; accord *Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 909 (2d Cir.1980) ("[T]o support a copyright the original aspects of a derivative work must be more than trivial."). Further, "the requirement of originality [cannot] be satisfied simply by the demonstration of 'physical skill' or 'special training' . . . ." *Batlin,* 536 F.2d at 491; see also *Tempo Music, Inc. v. Famous Music Corp.,* 838 F.Supp. 162, 170 (S.D.N.Y.1993) (discussing *Batlin* ). Our discussions of the originality standard in recent decisions, such as *Weissmann,* 868 F.2d at 1321, and *Gaste v. Kaiser-*

*man,* 863 F.2d 1061, 1066 (2d Cir.1988), upon which Bourne relies, do not render the *Batlin* standard inapplicable. See *Waldman Publishing Corp. v. Landoll, Inc.,* 43 F.3d 775, 782 (2d Cir.1994) (relying on *Batlin* as authoritative statement of originality requirement).

In *Batlin* we warned that "[t]o extend copyrightability to minuscule variations would simply put a weapon for harassment in the hands of mischievous copiers intent on appropriating and monopolizing public domain work." 536 F.2d at 492. At least one other circuit, relying on this court's opinion in *Batlin,* has advised special caution in analyzing originality in derivative works, since too low a threshold will "giv[e] the first [derivative work] creator a considerable power to interfere with the creation of subsequent derivative works from the same underlying work." *Gracen v. Bradford Exchange,* 698 F.2d 300, 305 (7th Cir.1983). As the *Gracen* court explained in discussing the originality requirement for a painting derived from a photograph, there must be "sufficiently gross difference between the underlying and the derivative work to avoid entangling subsequent artists depicting the underlying work in copyright problems." 698 F.2d at 305. This observation may be particularly relevant in the musical context. While it is easy enough to describe the threshold of originality as being low, it is difficult to translate this standard from one medium to another. See *Tempo Music,* 838 F.Supp. at 170 ("[T]he risk of copyright confusion seems particularly significant in music cases given that finders of fact often lack musical expertise."); 1 Nimmer § 2.05[C] at 2–57 (noting "tendency to require a somewhat greater degree of originality in order to accord copyright in a musical arrangement"). But see 1 William F. Patry, Copyright Law and Practice 237 (1994).

Bourne argues that the district court overstated the degree of originality required for an arrangement of a song to merit derivative work status. Bourne focuses on the court's statement that "[t]here must be such things as unusual vocal treatment, additional lyrics of consequence, unusual altered harmonies, novel sequential uses of themes. . . ." 841

F.Supp. at 121. We agree that the sentence that Bourne quotes does overstate the standard for derivative work originality. As we have observed on several occasions, the requirement of originality is not the same as the requirement of novelty, the higher standard usually applied to patents. E.g., *Batlin*, 536 F.2d at 490 ("[T]here must be independent creation, but it need not be invention in the sense of striking uniqueness, ingeniousness, or novelty...."); *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102–03 (2d Cir.1951). However, we read the district court's statement as brief dictum within a discussion that otherwise does identify the correct standard.

Earlier in its opinion, the district court correctly cited the statutory definition of a derivative work, which the court said required "the 'modification' to the composition to be an original work of authorship." 841 F.Supp. at 121. Following its apparent exaggeration of the standard for derivative work originality, the court explained that

> [there must be] something of substance added making the piece to some extent a new work with the old song embedded in it but from which the new has developed. It is not merely a stylized version of the original song where a major artist may take liberties with the lyrics or the tempo, the listener hearing basically the original tune. It is, in short, the addition of such new material as would entitle the creator to a copyright on the new material.

*Id.*

This, we believe, is a correct statement of the originality standard as set out in *Batlin*. The first and third sentences simply reiterate *Batlin*'s "substantial variation" requirement. The second sentence, disqualifying "stylized version[s] of the original song," as well as the district court's earlier dismissal of "cocktail pianist variations of the piece that are standard fare in the music trade by any competent musician," *id.*, merely express, in terms relevant to the musical context, our explanation in *Batlin* that "the demonstration of 'physical skill' or 'special training,'" 536 F.2d at 491, is insufficient to satisfy the requirement of originality. Because we conclude that the district court articulated the correct

standard of originality, we turn to consider the application of the standard to the facts of this case.

### 2. Application of the Originality Standard

To determine whether a work is sufficiently original to be a derivative work, the judge in a bench trial must make findings of fact based upon a comparison of two works. The judge must then apply the legal standard of originality to the facts to determine whether the standard has been met. Although this seems at first blush to be a two-step process, with review of the factual findings governed by a clearly erroneous standard and the legal conclusion subject to de novo review, most courts, including this one, apparently view the process as purely a factual inquiry, reviewable for clear error alone. E.g., *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 763 (2d Cir.1991); *Weissmann v. Freeman*, 868 F.2d 1313, 1322 (2d Cir.1989) (citing Fed.R.Civ.P. 52(a)); *Financial Information, Inc. v. Moody's Investors Serv., Inc.*, 808 F.2d 204, 207 (2d Cir.1986), cert. denied, 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987); cf. *American Geophysical Union v. Texaco, Inc.*, 37 F.3d 881, 886 (2d Cir.1994), as amended on denial of reh'g (analyzing fair use), petition for cert. filed, 63 U.S.L.W. 3788 (U.S. Apr. 24, 1995) (No. 94–1726); 1 Patry, Copyright Law and Practice 145 n. 106 (cataloguing cases). Regardless of the applicable standard of review, in the instant case we believe that there is adequate support in the record for Judge Owen's determinations. In other words, on this aspect of the case we find that the district court did not err—period. Obviously, therefore, it did not clearly err.

### a. The piano-vocal arrangement

Harry Woods is the sole person identified as author of the words and music on copyright certificates for both the lead sheet and the piano-vocal arrangement that Berlin obtained in 1926. No one else is listed as the arranger of either of these works, but later Bourne-authorized derivative works do list different arrangers. Although the district court did not rely heavily on these uncontested facts, we view them as evidence

supporting the district court's conclusion that Woods, not Berlin, composed the Song represented by both the lead sheet and the piano-vocal arrangement or at least that at the time of the grant, Berlin credited Woods with such authorship. A reasonable inference could be made that the piano-vocal arrangement closely approximated the composition conveyed from Woods to Berlin in 1926. Thus, regardless of whether the piano-vocal arrangement may be considered original as compared with the lead sheet, any original creativity that went into producing it was the result of Woods's effort and occurred before the rights in the composition were granted to Berlin.

This theory, apparently adopted by the district court, is supported by the trial testimony of Beebe Bourne, the current president of Bourne, Inc. and the daughter of one of Berlin's founders. She testified to the operating procedure at Berlin in 1926, stating:

a Harry Woods would come in then and in subsequent years and bring in what we call a lead sheet.... And they would often work at the piano. Some of the musicians ... could not even read and write music as we know it, but had a tremendous ear for sound. They would come in and it would be reviewed ... to determine the merits of it insofar as the commercial salability for those times.

Later she explained that in-house editors, whom she referred to as "technicians," would "actually write the piano vocal...."

These statements, that the Berlin employees who physically wrote out the musical notes were "technicians," and that the composers "would often work at the piano" when they came in to sell a song, certainly lend additional support to the district court's view that any act of independent creation distinguishing the lead sheet from the piano-vocal arrangement was attributable to Woods before he sold the Song to Berlin. 841 F.Supp. at 121 (noting that Woods "doubtless played the song for Berlin when he brought it into the firm.").

The scant record evidence thus suggests that the lead sheet and the piano-vocal arrangement were simply two different renderings of a single composition, the rights in which Woods granted to Berlin. Upon termination, the heirs recovered rights in the composition, rendered in both forms, and any subsequent Bourne arrangements that were not sufficiently original to be considered derivative works.

In addition to finding that the piano-vocal arrangement essentially represents the composition granted from Woods to Berlin, the district court found that the piano-vocal arrangement is not sufficiently original compared with the lead sheet to be considered a derivative work. A side-by-side comparison of the two printed documents quickly reveals that they are not literally identical. But it is not readily apparent whether the differences between the two documents are "substantial." At trial, both Callicoon and Bourne presented expert testimony on whether the differences were "substantial variations" reflecting deliberate aesthetic choices or merely "trivial" changes dictated, for instance, by applying conventional rules of harmony to the melody in the lead sheet. The district court was ultimately persuaded by Callicoon's expert, Thomas Shepard, that the variations in the piano-vocal arrangement were insubstantial.

We have considered the record before the district court, and we cannot say that on the particular facts before it the court erred in making this determination. Accordingly, even if all the disputed performances were based upon the piano-vocal arrangement, as Bourne contends, this would not compel judgment for Bourne.

Moreover, even if the piano-vocal arrangement could fairly be described as a derivative work, there is little if any evidence in the record to suggest that the versions of the Song in sound recordings and audiovisual works were based upon the piano-vocal arrangement. To the contrary, Callicoon's expert testified that each performance he had listened to was different. The only common elements were the words and melody contained in the lead sheet. He also stated that arrangers do not always use piano-vocal arrangements in developing subsequent arrangements; they often work from memory or from lead sheets. Therefore, even if the

district judge had agreed with Bourne that the piano-vocal arrangement was a derivative work, the judge need not have concluded that the performances of the Song were ultimately performances of the piano-vocal arrangement.

### b. The 1981 arrangement

■ A new arrangement of the Song was made under license from Bourne in 1981. This arrangement is potentially significant because, according to Bourne, it is this arrangement that is performed in the post-termination Delta Faucet commercial, which has earned approximately $13,000 in performance royalties. The district court found that the 1981 arrangement "in no way exhibits the degree of creativity required to make it a derivative work." *Id.* at 123.

According to both parties' experts, the principal variation in the 1981 arrangement as compared with the piano-vocal arrangement concerns the bass line in the piano part. While the bass line in the first piano-vocal arrangement consists primarily of quarter notes on the first and third beat of each measure, there is a so-called "moving bass line" in the 1981 arrangement.

As with the piano-vocal arrangement, we have considered the record before the district court, and we are unable to conclude that the court erred in finding the 1981 arrangement, which Bourne contends was used in the Delta Faucet commercial, insufficiently original to be called a derivative work. Accordingly, Bourne is not entitled to post-termination royalties from the Delta Faucet commercial. The judgment of the district court is affirmed to the extent that it awards royalties from the Delta Faucet commercial to Callicoon.

### c. Other printed and performed arrangements

We have reviewed the evidence concerning other recorded and printed arrangements and find that the district court did not err in its determinations regarding the originality of any of these arrangements.

As we stated above, Bourne would not be entitled to royalties generated by post-termination radio performances of pre-termination sound recordings unless the arrangements in those recordings were themselves Bourne-authorized derivative works. Since we are unable to conclude that the district court erred in finding none of the Bourne-authorized arrangements (with the exception of one performance by Fred Waring) to be derivative works, we affirm the judgment of the district court to the extent that it awards Callicoon royalties from post-termination performances of pre-termination sound recordings. We also affirm the court's judgment to the extent that it orders Bourne to remit to Callicoon reprint royalties that Bourne continued to receive after termination.

### C. Royalties from Performances Where Source Material was not Identified

We are left with the category of royalties, worth about $18,000, pertaining to radio and television performances monitored by AS-CAP for which source materials were not sufficiently identified. The district court placed the burden on Bourne, as the party claiming an exception to the heirs' right of termination to prove that any post-termination performances were based upon pre-termination derivative arrangements of the Song. 841 F.Supp. at 122 (citing *United States v. Allen,* 163 U.S. 499, 16 S.Ct. 1071, 41 L.Ed. 242 (1896)). Finding that Bourne failed to meet this burden, the court awarded the royalties to Callicoon.

On appeal, Bourne claims that the recapture right and the Derivative Works Exception are two parts of a legislative compromise, and that the two parts should be placed "on a level playing field." On that view, Bourne contends that the usual rule, requiring a party claiming an exception to bear the burden of proof, does not apply. Bourne then argues that because it is "more likely than not" that post-termination performances are performances of Bourne-authorized derivative works, the burden of proof should in fact be on Callicoon. In the alternative, Bourne suggests that royalties from unidentified performances be allocated in proportion to royalties for all identified performances.

We are unpersuaded by Bourne's argument that the Derivative Works Exception should not be treated like any other exception to a statutory rule. It is clear from the statutory scheme that it is indeed an exception to the general rule of reversion of rights to the author's heirs upon termination, and it was thus described by the Supreme Court in *Mills Music*, 469 U.S. at 162, 105 S.Ct. at 644. Therefore, we hold that the district court properly placed the burden on Bourne to prove that particular performances were based upon Bourne-authorized derivative works.

Because, as the parties stipulated, the "source materials" for these performances were unidentified, it is impossible to determine from the record whether the works performed were created before or after termination. As to the unidentified television performances, Bourne has introduced no evidence that any of these disputed performances were of pre-termination audiovisual works, which would entitle it to royalties under the analysis of Part A above. In addition, in light of our affirmance of the district court's ruling that virtually none of the Bourne-authorized arrangements are derivative works, it is not more likely than not that unidentified performances are performances of Bourne-authorized derivative works. Thus, the district court did not err in finding that Bourne had failed to satisfy its burden of proof. Accordingly, we affirm the judgment to the extent that it awarded Callicoon approximately $18,000 attributable to post-termination performances of unidentified material.

### D. Miscellaneous Issues

The briefs raise two additional issues that should be decided on remand. First, the parties dispute entitlement to certain royalties from a musical work, "Freckles," that allegedly infringed the copyright in the Song. During the renewal term, Bourne entered into a settlement agreement with the publisher of "Freckles." The district court apparently determined that Callicoon is entitled to receive royalties from "Freckles" during the extended renewal term, but the basis of the ruling is not clear in the opinion. Second, Bourne raises a question concerning an episode of "The Lucy Show" for which Bourne had issued a synch license in 1973. The synch license had a five-year term, and Bourne apparently never renewed the license. However, during the extended renewal term, in 1988 and again in 1990, Callicoon issued renewal licenses for the same "Lucy Show" episode, for which it received a total of $1,700. Bourne now contends that by issuing these renewal licenses Callicoon was encroaching on Bourne's right to utilize during the extended renewal term derivative works prepared before termination. In its opinion, the district court did not address Bourne's contention. We remand to the district court to decide both the "Freckles" and "Lucy Show" issues in accordance with the principles set forth in this opinion.

### III. Conclusion

To summarize, we hold as follows: (1) As to performance royalties attributable to pre-termination movies and television programs, the judgment of the district court is reversed. The royalties withheld by ASCAP from those performances should be paid in accordance with the terms of the grant of performance rights from Bourne to ASCAP and from ASCAP to television stations that existed immediately before termination; (2) The judgment of the district court is affirmed as to (a) royalties attributable to radio performances of pre-termination sound recordings, (b) reprint royalties, (c) the Delta Faucet commercial, and (d) unidentified television and radio performances; (3) On remand, the district court should address the "Freckles" and "Lucy Show" issues and enter judgment consistent with this opinion.[5]

---

5. After Bourne appealed, the district court awarded attorneys' fees to Callicoon, finding that Bourne had adopted an "objectively unreasonable" position. *Woods v. Bourne Co.*, 858

F.Supp. 399 (S.D.N.Y.1994). Although Bourne asks us to address the award of attorneys' fees, that judgment was not the subject of Bourne's notice of appeal and the issue is not properly before us. We assume that, in view of our disposition of this appeal, the district court will reconsider its ruling on attorneys' fees.