**MARVEL CHARACTERS, INC.,
Plaintiff–Counter–Defendant–
Appellee,**

v.

**Joseph H. SIMON, Defendant–Counter–
Claimant–Appellant.**

**Docket No. 02–7221.**

United States Court of Appeals,
Second Circuit.

Argued: June 3, 2002.

Decided: Nov. 7, 2002.

Ethan Horwitz, Goodwin Procter LLP, New York, NY (Kandis M. Kahn, on the brief), Ross J. Charap, Moses & Singer LLP, New York, NY, on the brief, Darby & Darby PC, New York, NY, on the brief, for Defendant–Counter–Claimant–Appellant.

David Fleischer, Paul, Hastings, Janofsky & Walker LLP, New York, NY (Jodi A. Kleinick, on the brief), for Plaintiff–Counter–Defendant–Appellee.

Kay Murray, The Authors Guild, Inc., New York, NY, for Amici Curiae The Authors Guild, Inc.; The American Society of Journalists and Authors; The American Society of Media Photographers, Inc.; The

Graphic Artists Guild; and The Society of Children's Book Writers and Illustrators.

Before: KEARSE and McLAUGHLIN, Circuit Judges, and HAIGHT, District Judge.*

McLAUGHLIN, Circuit Judge.

This appeal requires us to examine the scope of the termination provision of the Copyright Act of 1976 (the "1976 Act"), 17 U.S.C. § 304(c). Section 304(c) grants authors (or if deceased, their statutory heirs) an inalienable right to terminate a grant in a copyright fifty-six years after the original grant "notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(3),(5). The termination provision, however, has one salient exception: copyright grants in works created for hire cannot be terminated. 17 U.S.C. § 304(c).

The question of first impression raised here is whether a settlement agreement, entered into long after a work's creation, stipulating that a work was created for hire constitutes "any agreement to the contrary" under the 1976 Act. We conclude that it does and, therefore, reverse.

## BACKGROUND

This being an appeal from a grant of summary judgment to plaintiff Marvel Comics, Inc. ("Marvel"), we view the deposition testimony, affidavits, and documentary evidence in the light most favorable to defendant Joseph H. Simon, the non-moving party. *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 165 (2d Cir.2001).

### I. *Publication of Captain America Comics*

In December 1940, Martin and Jean Goodman, doing business as Timely Publi-cations and Timely Comics, Inc. (collectively "Timely") published the first issue of the now iconic *Captain America Comics.* Captain America, a.k.a. Steve Rogers, was an army-reject turned superhero who was charged with protecting America from all enemies, especially Nazi spies. Authorship of the comic book was attributed to Simon and Jack Kirby.

According to Simon, he created Captain America as an independent, freelance project before shopping it around to various publishers. Although there was no written agreement between the parties, Simon contends that he sold the Captain America story to Timely for a fixed page rate plus a twenty-five percent share of the profits of the comic books. Simon also maintains that he created the second through tenth issues of *Captain America Comics* on a freelance basis, and orally assigned his interest in *Captain America Comics* and the Captain America character (collectively the "Works") to Timely.

During 1941, Timely published the second through tenth issues of *Captain America Comics.* Shortly after their publication, Timely applied for and received certificates of registration of the copyrights for each issue of the Works. The Works were a tremendous success, and to this day continue to generate substantial revenue for Marvel, Timely's successor in interest.

### II. *The Copyright Act of 1909*

Under the Copyright Act of 1909 (the "1909 Act"), in effect at the time of Simon's purported creation of Captain America and assignment to Timely, an author was entitled to a copyright in his work for twenty-eight years from the date

---

* The Honorable Charles S. Haight, Jr., United States District Judge for the Southern District of New York, sitting by designation.

of its publication. 17 U.S.C. § 24, *repealed by* Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* Upon expiration of the first twenty-eight year term, the author could renew the copyright for a second twenty-eight year period (the "renewal term") simply by applying to the United States Copyright Office ("Copyright Office"). *Id.* The Supreme Court has noted that the renewal term operated to "permit[ ] the author, originally in a poor bargaining position, to renegotiate the terms of the grant once the value of the work has been tested." *Stewart v. Abend,* 495 U.S. 207, 218–19, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990); *see also Woods v. Bourne Co.,* 60 F.3d 978, 982 (2d Cir.1995) ("[Through the renewal term] Congress attempted to alleviate the problem of the inability of authors to know the true monetary value of their works prior to commercial exploitation."). As the House committee which drafted the 1909 Act explained, "it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right." H.R.Rep. No. 60–2222, at 14 (1909).

### III. *The Prior Actions*

As the initial twenty-eight year term of copyright in the Captain America Works neared its completion, Simon commenced two separate lawsuits (the "Prior Actions") against the Goodmans and their affiliates.

In October 1966, Simon sued in New York State Supreme Court (the "State Action") claiming that, because he was the author of the Works, the Goodmans' exploitation of the Captain America character constituted unfair competition and misappropriation of his state law property rights. *See* Complaint, *Joseph H. Simon v. Martin Goodman and Jean Goodman, individually and d/b/a Magazine Mgmt. Co., Krantz Films, Inc., R.K.O. Gen., Inc.,* and *Weston Merch. Corp.* (R. at 117). Simon sought an accounting, damages, and injunctive relief in the State Action. *See id.*

One year later, Simon filed a similar action against the Goodmans and their affiliates in the United States District Court for the Southern District of New York (the "Federal Action"). In this action, Simon sought a declaratory judgment that he, as the author of the Works, had the sole and exclusive right to the renewal term of the copyright in the Works. *See* Complaint, *Joseph H. Simon v. Martin Goodman and Jean Goodman, individually and d/b/a Magazine Mgmt. Co. and Timely Comics, Inc.* (R. at 142–48). He also sought injunctive relief to prohibit the Goodmans from applying for renewal registrations of the Works. *See id.* Simon was represented by counsel in the Prior Actions.

In both of the Prior Actions, the defendants denied that Simon was the sole author of the Works. In the State Action, the defendants specifically argued that Simon's contributions to the Works were made as an "employee for hire." *See* Defendants' Answer and Counterclaims (R. at 136–39). In the Federal Action, the defendants asserted a counterclaim for a judgment declaring that Timely owned the copyrights in the Works and therefore Simon should be enjoined from applying to renew such copyrights. *See* Defendants' Answer (R. at 150–55). While the Prior Actions were pending, Timely's successor in interest applied to the Copyright Office for renewal of the copyrights in the Works.

In November 1969, after two years of discovery, the parties to the Prior Actions entered into a settlement agreement (the "Settlement Agreement"). In the Settlement Agreement, Simon acknowledged that his contribution to the Works "was done as an employee for hire of the Goodmans." (R. at 185). Pursuant to this Set-

tlement Agreement, Simon assigned "any and all right, title and interest he may have or control or which he has had or controlled in [the Works] (without warranty that he has had or controlled any such right, title or interest)" to the Goodmans and their affiliates. (R. at 179–80). The parties to both actions filed stipulations with the respective courts dismissing with prejudice "all claims and matters alleged, threatened, implied or set forth in any of the pleadings filed by [Simon]." (R. at 188–91).

### IV. *The Copyright Act of 1976*

The legislative purpose behind the 1909 Act's renewal right—to provide authors a second chance to benefit from their works—was dealt a serious blow by the Supreme Court's decision in *Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943). *See Woods,* 60 F.3d at 982. In *Fisher Music,* the Supreme Court addressed the renewal rights in the ever-popular (not to mention mellifluous) song "When Irish Eyes Are Smiling." The Court held that renewal rights were assignable by an author during the initial copyright term, before the renewal right vested. *See id.,* 318 U.S. at 656–59, 63 S.Ct. 773.

Not surprisingly, after *Fisher Music* publishers began to insist that authors assign both their initial and renewal rights to them in one transfer. The natural effect of this, of course, was to eliminate the author's renewal right under the 1909 Act.

In 1976, Congress enacted a comprehensive revision of the Copyright Act. *See* Pub.L. No. 94–553 (1976)(codified at 17 U.S.C. §§ 101–810); *see also Mills Music, Inc. v. Snyder,* 469 U.S. 153, 159–62, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985). Responding to the continual erosion of authors' rights subsequent to the 1909 Act,

Congress extended the duration of copyrights then in their renewal terms for an additional nineteen years (the "extended renewal term"). *See* 17 U.S.C. § 304(b). More significantly, however, the 1976 Act gave new protections to authors. It allowed authors to terminate the rights of a grantee to whom the author had transferred rights in the original work. *See* 17 U.S.C. § 304(c); *Woods,* 60 F.3d at 982. This termination provision provides, in relevant part:

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, *other than a copyright in a work made for hire,* the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated [by statute], otherwise than by will, is subject to termination under the following conditions:
>
> . . .
>
> (5) Termination of the grant may be effected *notwithstanding any agreement to the contrary,* including an agreement to make a will or to make any future grant.

17 U.S.C. §§ 304(c) and 304(c)(5) (emphasis added). Section 304 further provides that terminations may be "effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured." 17 U.S.C. § 304(c)(3).

### V. *The Proceedings Below*

In December 1999, recognizing an opportunity created by § 304(c) to reclaim his copyright in the Works, Simon filed Notices of Termination (the "Termination Notices") with the Copyright Office purporting to terminate his transfers of the copyrights to Timely pursuant to § 304(c). In the Termination Notices, Simon claimed

that he independently created the Captain America character and authored the first issue in the Captain America comic book series, and that he was "neither an employee for hire nor a creator of a work for hire."

Thereafter, Marvel—as Timely's successor in interest in all rights, title, and interest to the Works by virtue of a series of assignments—commenced this action in the United States District Court for the Southern District of New York (Casey, *J.*) seeking a declaratory judgment that the Termination Notices were invalid and that Marvel remains the sole owner of the copyrights in the Works. Simon in turn filed a counterclaim for a declaratory judgment that: (1) he is the sole author of the Works; (2) the Termination Notices are valid; and (3) all copyrights in the Works revert to him on the effective date of the Notices of Termination.

After discovery, Marvel moved for summary judgment on its claim for a declaration that Simon's Termination Notices were invalid. Marvel argued that it was entitled to summary judgment on three separate grounds: (1) equitable estoppel; (2) res judicata; and (3) fundamental principles of contract law. Each argument was bottomed on the premise that the new termination right granted to authors under § 304(c) of the 1976 Act did not apply to Simon because the Settlement Agreement expressly stated that he was not the author of the Works for copyright purposes.

The district court found that Marvel's equitable estoppel argument was meritless. With respect to Marvel's res judicata argument, the district court held that the termination right at issue in this action was "an entirely new and wholly separate right from the renewal right" at issue in the Prior Actions. *Marvel Characters, Inc. v. Simon,* No. 00 Civ. 1393, 2002 WL 313865, at *6 (S.D.N.Y. Feb. 27, 2002). Because

the Prior Actions could not have resolved the question of whether Simon was entitled to termination rights, the district court found that this claim was not barred by res judicata. *See id.* at *6–*7. The district court also rejected Marvel's argument that Simon is precluded from raising the *issue* of authorship needed to support his claim that the Termination Notices are valid. *See id.* In rejecting this argument, the district court noted that the authorship issue was not fully and fairly litigated on the merits in the Prior Actions. *See id.* The district court did, however, find that Simon's counterclaim seeking a declaration that he is the author of the Works was barred by res judicata because this claim was resolved in Marvel's favor under the Settlement Agreement. *See id.* at *7. (Simon does not appeal the district court's ruling on this counterclaim.)

Turning to the merits of Marvel's claims that the Termination Notices are invalid and Marvel is the sole owner of the copyright in the Works, the district court held that Marvel was entitled to summary judgment on these claims based on the plain language of the Settlement Agreement. The court found that Simon's unambiguous acknowledgment in the Settlement Agreement that he created the Works "for hire" prevented Simon from exercising the termination right under § 304(c).

This appeal followed.

## DISCUSSION

### I. *Standard of Review*

■ We review a district court's grant of summary judgment *de novo. Republic Nat'l Bank of New York v. Delta Air Lines,* 263 F.3d 42, 46 (2d Cir.2001).

■ The standards governing summary judgment are well-settled. Summary judgment is appropriate only "if the plead-

ings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gallo v. Prudential Residential Servs. L.P.,* 22 F.3d 1219, 1223–24 (2d Cir.1994).

■■■ In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant, in this case Simon. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party. *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000).

## II. *The Preclusive Effect of the Prior Actions*

Determining the preclusive effect of the Prior Actions requires an analysis of the common law doctrines of res judicata and collateral estoppel. These related but distinct doctrines operate to prevent parties from contesting matters that they have had a full and fair opportunity to litigate, thereby conserving judicial resources and protecting parties from the expense and vexation of multiple lawsuits. *See, e.g., Montana v. United States,* 440 U.S. 147,

153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

We apply federal law in determining the preclusive effect of a federal judgment, *PRC Harris, Inc. v. Boeing Co.,* 700 F.2d 894, 896 n. 1 (2d Cir.1983), and New York law in determining the preclusive effect of a New York State court judgment, *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *see also* 28 U.S.C. § 1738 (implementing the Full Faith and Credit Clause of the United States Constitution). The parties agree that there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel. *See, e.g., Pike v. Freeman,* 266 F.3d 78, 90 n. 14 (2d Cir.2001). Therefore, we see no need to undertake a separate analysis of the preclusive effect of the Federal and State Actions.

On this appeal, Marvel contends that there is no meaningful distinction between the authorship issue raised in the Prior Actions and the termination right at issue in this case. Therefore, according to Marvel, res judicata bars Simon from asserting that he is the author of the Works in order to exercise his termination right under § 304(c). In contrast, Simon argues that the district court was correct in finding that neither res judicata nor collateral estoppel barred him from asserting that he was the Works' author because the factual *issue* of authorship was never fully and fairly litigated in the Prior Actions and is quite different from his present *claim* to termination rights in the Works. Simon is correct.

### A. *Res judicata*

■■■ Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised

in that action. *See Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). It is clear that a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment for res judicata purposes. *See, e.g., Nemaizer v. Baker,* 793 F.2d 58, 60–61 (2d Cir.1986). It is equally well settled, however, that a prior judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 328, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). Likewise, res judicata does not bar subsequent litigation when the court in the prior action could not have awarded the relief requested in the new action. *See, e.g., Leather v. Eyck,* 180 F.3d 420, 425 (2d Cir.1999); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986).

Whether a claim that was not raised in the previous action could have been raised therein "depends *in part* on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992) (internal quotations omitted) (emphasis added). "Also dispositive to a finding of preclusive effect, is whether an independent judgment in a separate proceeding would impair or destroy rights or interests established by the judgment entered in the first action." *Sure–Snap Corp. v. State Street Bank & Trust Co.,* 948 F.2d 869, 874 (2d Cir.1991) (internal quotations omitted). To determine whether two actions arise from the same transaction or claim, "we look to whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Pike,* 266 F.3d at 91 (internal quotations omitted).

However, "[t]hat both suits involved essentially the same course of wrongful conduct is not decisive." *Lawlor,* 349 U.S. at 327, 75 S.Ct. 865 (internal quotations omitted). For a single course of conduct may give rise to more than a single cause of action for res judicata purposes. *See id.* at 327–28, 75 S.Ct. 865.

Although they spring from the same set of underlying facts, the claims at issue in the Prior Actions and the claims asserted in the current action are plainly distinct. In the Prior Actions, Simon claimed that he was entitled to the *renewal* term of copyright for the Works. In the present suit, Simon claims that he is entitled to terminate Marvel's copyright in the Works and obtain the extended copyright term by virtue of § 304(c) of the 1976 Act. As the district court correctly recognized, neither the extended copyright term nor the termination right existed at the time of the Prior Actions. Indeed, the termination right is an entirely new and wholly separate right than the renewal right. Hence, the Prior Actions could not have resolved the question of whether Simon was entitled to termination rights in the extended copyright term. Nor could the Prior Actions have awarded the relief requested in this action—the right to terminate the grant to Marvel and obtain the right to the extended copyright term—as that relief was likewise unavailable at that time.

Marvel cites *Precision Air Parts, Inc. v. Avco Corp.,* 736 F.2d 1499 (11th Cir.1984), and *Hernandez v. City of Lafayette,* 699 F.2d 734 (5th Cir.1983) for the proposition that "[a] change in law ... will only enable a party to re-litigate a claim where that change could have affected the outcome of

the litigation." Appellee's Br. at 30. Marvel also argues, correctly, that despite the enactment of the 1976 Act, the 1909 Act governs the authorship of the Works at issue here. *See, e.g., Roth v. Pritikin,* 710 F.2d 934, 937–39 (2d Cir.1983) (holding that the 1976 Act's "work for hire" provisions—which differ from the 1909 Act—are not to be applied retroactively). However, it does not follow, as Marvel suggests, that since the Works' authorship was at *issue* in the previous actions, Simon's termination *claim* is precluded here. While Simon's assertion of authorship is the *sine qua non* of both his prior claim to renewal rights and his present claim to termination rights, it is merely an *issue* that determines the viability of each claim. *See Yoon v. Fordham Univ. Faculty & Admin. Retirement Plan,* 263 F.3d 196, 202 (2d Cir.2001).

This Court's reasoning in *Yoon* is instructive. In that case, the plaintiff had previously litigated and defaulted on his state court claim that he was entitled to his teaching salary. Thereafter, Yoon filed a suit in federal court claiming entitlement to pension benefits under ERISA. The district court granted the defendant's motion to dismiss, holding that Yoon's ERISA claim was barred on res judicata grounds. *See id.* at 198–200. On appeal, the defendant urged this Court to affirm the district court's decision because res judicata prevented Yoon from proving his entitlement to pension benefits. We rejected that argument, explaining:

> [T]he fact that, because of *res judicata,* Yoon cannot raise the question of his right to salary *for purposes of getting salary* (past, present, and future) does not mean that he is barred from raising the question of his entitlement to salary in order to establish a contractual basis for the payment of pensions. For to deprive Yoon of the right to litigate the *issue* of his entitlement to salary would

be to estop him collaterally from doing so.

*Id.* at 202 n. 7 (emphasis in original); *accord St. Pierre v. Dyer,* 208 F.3d 394, 400–01 (2d Cir.2000) (finding that even if the plaintiff's claims for damages were barred by res judicata, "he is not necessarily precluded from proving [some of the underlying issues of that claim] in connection with" his claims for indemnification and contribution).

■ Applying *Yoon's* reasoning here, it is clear that Simon is not precluded from claiming that he is the author of the Works for purposes of exercising the termination right under § 304(c). While Simon would be precluded from claiming that he was entitled to benefits flowing from the initial twenty-eight year renewal period, that is not his claim. He is claiming that he is entitled to terminate Marvel's copyright in the Works, a claim that did not exist when the Prior Actions were settled. Therefore, the district court was correct that res judicata does not bar Simon from asserting that the Termination Notices are valid.

## B. *Collateral Estoppel*

■ Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding. *See Boguslavsky v. Kaplan,* 159 F.3d 715, 719–20 (2d Cir.1998); *see also Comm'r of Internal Revenue v. Sunnen,* 333 U.S. 591, 598, 68 S.Ct. 715, 92 L.Ed. 898 (1948) ("Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel."). Collateral estoppel applies when: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the

issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Boguslavsky,* 159 F.3d at 720 (internal quotations omitted).

■ Simon does not dispute that he raised the issue of the Works' authorship in the Prior Actions; nor does he contest that, by virtue of the stipulations of dismissal filed in the Prior Actions, he did not prevail on that issue. However, where a stipulation of settlement is "unaccompanied by findings," it does "not bind the parties on any issue ... which might arise in connection with another cause of action." *Lawlor,* 349 U.S. at 327, 75 S.Ct. 865; *see also Motrade v. Rizkozaan, Inc.,* No. 95 Civ. 6545, 1998 WL 108013, at *5 (S.D.N.Y. March 11, 1998) ("To have a preclusive effect on specific issues or facts, however, a voluntary dismissal also must be accompanied by specific findings sufficient for a subsequent court to conclude that certain matters were actually decided.").

■ Here, although the Settlement Agreement contained detailed findings on the authorship issue, neither of the stipulations filed in the Prior Actions contain any specific findings as to whether Simon authored the Works independently or whether the Captain America character was created as a work for hire. Nor do the stipulations reference the Settlement Agreement in any way. Therefore, the stipulations do not collaterally estop Simon from litigating the *issue* of authorship underlying his termination claim in this action.

### III. *Application of Section 304(c) of the 1976 Act*

■ Having concluded that Simon is not precluded from asserting that he is the author of the Works for purposes of exercising his statutory termination right, we turn, at length, to the issue of first impression presented by this case: whether an agreement made subsequent to a work's creation that declares that it is a work created for hire constitutes an "agreement to the contrary" under § 304(c)(5) of the 1976 Act. The district court never addressed this question. Instead, it simply assumed that because Simon had conceded in the unambiguous Settlement Agreement that the Works were created for hire, he could not now assert that he was the Works' author for purposes of exercising the termination right in this action. While the district court was undoubtedly correct that the Settlement Agreement is not ambiguous—a contention disputed by the amici curiae—this is not the relevant analysis on this issue. Instead, we must analyze the legislative intent and purpose of § 304(c) of the 1976 Act to determine its application to this case.

Simon contends that the district court's failure to give effect to § 304(c)'s mandate that authors can terminate copyright grants "notwithstanding any agreement to the contrary" contravenes the legislative intent and purpose of § 304(c). Further, because Simon has submitted testimony that he was not in fact an employee for hire when he created the Captain Marvel character, he maintains that a genuine issue of material fact exists regarding Marvel's claims that the Termination Notices are invalid and it is the sole owner of the copyright in the Works. Marvel's only response to Simon's contentions is that if Simon's reading of the statute is upheld, no litigation concerning a claim to authorship could ever be resolved by settlement. We find Simon's arguments persuasive and Marvel's prediction unfounded.

■ In order to determine the meaning of § 304(c), we apply the well established canons of statutory construction. In

interpreting a statute, we look first to the language of the statute itself. *See, e.g., Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989); *Auburn Housing Auth. v. Martinez,* 277 F.3d 138, 143 (2d Cir.2002). When the language of a statute is unambiguous, "judicial inquiry is complete." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). When the terms of a statute are ambiguous, however, we may seek guidance in the legislative history and purpose of the statute. *See Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000). In so doing, we must "construct an interpretation that comports with [the statute's] primary purpose and does not lead to anomalous or unreasonable results." *Connecticut v. United States Dep't of the Interior,* 228 F.3d 82, 89 (2d Cir.2000).

Here, whether § 304(c)(5)'s phrase "any agreement to the contrary" includes a settlement agreement stating that a work was created for hire is not clear from the text of the statute itself. Generally speaking, the Settlement Agreement is an agreement to the contrary. But without more specific or compelling evidence from the text, we find it necessary to go beyond the mere text and consider the legislative intent and purpose of § 304(c) to ascertain the statute's meaning.

The Supreme Court has elucidated the intent and purpose behind the termination provision of the 1976 Act:

> The principal purpose of the amendments in § 304 was to provide added benefits to authors. The ... concept of a termination right itself, w[as] obviously intended to make the rewards for the creativity of authors more substantial. More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had

been made before the author had a fair opportunity to appreciate the true value of his work product. That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself.

*Mills Music,* 469 U.S. at 172–73, 105 S.Ct. 638 (footnote omitted) (interpreting the derivative works exception to the termination clause of § 304(c)). Furthermore, the legislative history of the termination provision reflects Congress's intent to protect authors from unequal bargaining positions. *See* H.R.Rep. No. 94–1476, at 124 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5740 ("A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited."); *see also Mills Music,* 469 U.S. at 173 n. 39, 105 S.Ct. 638. As these statements suggest, the clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract. *Accord Stewart,* 495 U.S. at 230, 110 S.Ct. 1750 ("The 1976 Copyright Act provides ... an inalienable termination right.").

When examining the legislative intent and purpose of § 304(c), it becomes clear that an agreement made after a work's creation stipulating that the work was created as a work for hire constitutes an "agreement to the contrary" which can be disavowed pursuant to the statute. Any other construction of § 304(c) would thwart the clear legislative purpose and intent of the statute. If an agreement between an author and publisher that a work was created for hire were outside the purview of § 304(c)(5), the termination provision would be rendered a nullity; litigation-savvy publishers would be able to utilize their superior bargaining position to compel authors to agree that a work was created for hire in order to get their works

published. In effect, such an interpretation would likely repeat the result wrought by the *Fred Fisher* decision and provide a blueprint by which publishers could effectively eliminate an author's termination right. We conclude that Congress included the "notwithstanding any agreement to the contrary" language in the termination provision precisely to avoid such a result.

This view finds support in *Nimmer on Copyright*:

> The parties to a grant may not agree that a work shall be deemed one made "for hire" in order to avoid the termination provisions if a "for hire" relationship ... does not in fact exist between them. Such an avoidance device would be contrary to the statutory provision that "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary." ... [I]t is the relationship that in fact exists between the parties, and not their description of that relationship, that is determinative.

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 11.02[A][2] (2000 ed.) (footnote omitted). This reading of the statute also explains why copyright grants in works created for hire are not subject to termination. *See* 17 U.S.C. § 304(c). Under the 1909 Act, the statutory author of a work created for hire was the employer-publisher. *See, e.g.,* 17 U.S.C. § 26 (repealed 1976); *Cmty. for Creative Non–Violence,* 490 U.S. at 743–44 & n. 9, 109 S.Ct. 2166. Because an employer-publisher does not face the same potential unequal bargaining position as an individual author, it follows that an employer-publisher does not need the same protections as an individual author.

This reading of § 304(c) is also consistent with the way in which courts have interpreted the 1909 Act's "work for hire" provision. Courts engaging in such an analysis have focused on the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work. *See, e.g., Donaldson Pub. Co. v. Bregman, Vocco & Conn, Inc.,* 375 F.2d 639, 640–42 (2d Cir. 1967) (holding that a composer's work was not created as a work for hire for defendant even though his contract with defendant provided him with a drawing account during his "employment"); *see also Murray v. Gelderman,* 566 F.2d 1307, 1310–11 (5th Cir.1978) (holding that a writer was not the "author" of a book produced by the defendant even though she expressly contracted for "exclusive control" of its contents).

Additionally, this Court has looked to agency law to determine whether a work is created "for hire" under the 1909 Act. *See Aldon Accessories Ltd. v. Spiegel, Inc.,* 738 F.2d 548, 552 (2d Cir.1984). And under agency law, "[t]he manner in which the parties designate the relationship is not controlling, and if an act done by one person in behalf of another is in its essential nature one of agency, the one is the agent of such other notwithstanding that he or she is not so called. Conversely, the mere use of the word 'agent' by parties in their contract does not make one an agent who, in fact, is not such." 3 Am.Jur.2d *Agency* § 19 (2002) (footnotes omitted).

Contrary to Marvel's dire prediction about an expansive interpretation of § 304(c), we believe that parties will still be able to resolve their authorship disputes by settlement. If parties intend to preclude any future litigation regarding authorship by settling their claims, they need only comply with the requirements of collateral estoppel by filing a detailed stipulation of settlement, complete with sufficient factual findings on authorship, with the court. Furthermore, when the relationship between parties has deteriorated to the point of litigation, presumably all

parties are represented by counsel. Accordingly, the need to protect "ill-advised" authors from publishers or other more sophisticated entities—the policy concern underlying § 304(c)—is no longer present.

In sum, we hold that an agreement made subsequent to a work's creation which retroactively deems it a "work for hire" constitutes an "agreement to the contrary" under § 304(c)(5) of the 1976 Act. Therefore, Simon is not bound by the statement in the Settlement Agreement that he created the Works as an employee for hire. Because Simon has proffered admissible evidence that he did not create the Works as an employee for hire, the district court's grant of summary judgment to Marvel was erroneous. It will be up to a jury to determine whether Simon was the author of the Works and, therefore, whether he can exercise § 304(c)'s termination right. *See, e.g., Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.,* 290 F.3d 98, 110 (2d Cir.2002) (noting that authorship is a jury question).

## IV. *Equitable Estoppel*

Marvel's final contention is that Simon is barred by the doctrine of equitable estoppel from asserting that he is the author of the Works. Marvel argues that if it knew that Simon would disavow the Settlement Agreement's admission that the Works were created for hire, it would have proceeded to trial in the Prior Actions and called both Martin Goodman and Jack Kirby as witnesses. As these two men have since died, Marvel contends that Simon should not now be able to raise the issue of his authorship of the Works in this action. We find Marvel's argument unpersuasive.

The doctrine of equitable estoppel can be raised "where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's

words or conduct." *Kosakow v. New Rochelle Radiology Assocs., P.C.,* 274 F.3d 706, 725 (2d Cir.2001). Under federal law, applicable because Marvel's claim involves a federal statute, a party can be estopped from pursuing a claim where: (1) the party makes a misrepresentation of fact to another party with reason to believe that the other party will rely on it; (2) the other party relies on the misrepresentation to his detriment. *See id.*

Marvel's estoppel argument is unpersuasive for three reasons. First, the doctrine of equitable estoppel does not supersede § 304(c). It is plain that § 304(c) necessarily contemplates the likelihood that long-dormant copyright ownership issues will be awakened and litigated once the original fifty-six year copyright term expires. In fact, Congress's goal in providing authors with this termination right was to enable them to reclaim long lost copyright grants. As the district court correctly recognized, virtually every copyright holder could fashion a similar equitable estoppel argument in response to an author's legitimate exercise of his termination rights. *See Marvel Characters, Inc.,* 2002 WL 313865, at *4. Permitting such an exception, however, would contravene the plain language, intent, and purpose of § 304(c).

Second, Marvel's argument ignores the fact that the termination right did not come into existence until 1978, the effective date of the 1976 Act. Therefore, it is specious to argue that Simon should be estopped from raising a claim that did not come into existence until almost a decade after the Settlement Agreement.

Finally, Marvel cannot establish detriment for equitable estoppel purposes. Marvel has received the full economic benefit of the Works' twenty-eight year renewal term. Even if a jury concludes that Simon is the Works' author and can there-

fore terminate Marvel's copyright in the Works, Marvel can continue to exploit every Captain America property created prior to the effective date of termination. *See Mills Music,* 469 U.S. at 173, 105 S.Ct. 638 (noting that pre-termination derivative works may continue to be utilized under the terms of the terminated grant).

Accordingly, Simon is not equitably estopped from raising his purported authorship of the Works in this action.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED. We hereby REMAND this action to the district court for further proceedings not inconsistent with this opinion.