**Glenda GLOVER, Plaintiff,**

v.

**Tracy Wynell JONES, d/b/a TW Jones Development, and Marvin K. Maye, Defendants.**

**No. 05–CV–6124 (CJS).**

United States District Court,
W.D. New York.

Sept. 24, 2007.

Christina A. Agola, Esq., Rochester, NY, for Plaintiff.

David G. Brock, Esq., William Chen, Esq., Jaeckle Fleischmann & Mugel, LLP, Buffalo, NY, for defendant Tracy Wynell Jones d/b/a TW Jones Development.

Robert M. Shaddock, Esq., Hiscock & Barclay LLP, Rochester, NY, for defendant Marvin K. Maye.

## DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

## INTRODUCTION

This is an action to recover damages for sexual harassment in the housing context, pursuant to the Fair Housing Act of 1968 ("FHA") as amended, 42 U.S.C. § 3601 *et seq.*, and the New York Human Rights Law ("NYHRL"), Executive Law § 290 *et seq.* Now before the Court are the following applications: 1) defendant Marvin Maye's ("Maye") motion [# 45] for summary judgment; and 2) defendant Tracy Wynell Jones's ("Jones") motion [# 49] for the same relief. For the reasons that follow, Maye's application is denied in its entirety, and Jones' application is granted in part and denied in part.

## BACKGROUND

Unless otherwise noted, the following are the facts of this case viewed in the light most favorable to Plaintiff. At all relevant times, Jones owned the rental property involved in this lawsuit, 50 Paige Street in the City of Rochester. Jones operated her property rental business as a

sole proprietor, under the assumed name "T.W. Jones Development." Jones employed Maye as a Property Manager, and granted him the authority to rent and manage the property.[1] (Jones Dep. 12, 14, 16; Maye Dep. 8, 10–11; Defendants' Answer ¶ 1) Jones' involvement with the property was limited to collecting rent checks and paying bills. (Jones Dep. 19) Maye, on the other hand, dealt directly with tenants, negotiated leases, set rents, and made repairs. (Jones Dep. 20, 22) There was no written employment agreement between Jones and Maye, nor did Jones have any type of personnel policies. (Jones Dep. 22) In fact, Jones did not exercise any control over Maye's day-to-day management of her properties.[2] Nevertheless, Jones and Maye admit that an agency relationship existed between them.[3]

In or about October 2002, Plaintiff contacted Maye about renting 50 Paige Street, since Maye had indicated to her that he owned the property. Maye showed Plaintiff the apartment and gave her a rental application. Plaintiff initially decided not to apply for the apartment, because she did not want to pay for a background and security check, and because she lacked the necessary funds to pay the requested security deposit. However, Maye told Plaintiff that because "he enjoyed her company," and "wanted her to have the house," he would dispense with the background and security check, and would allow her to pay the security deposit over time. Maye also purchased appliances for Plaintiff, with the

understanding that she would repay him for some of the appliances.

Plaintiff signed a lease agreement in or about October 2002, which required her to pay monthly rent of $675.00. The lease identified the lessor as TW Jones Development. However, Plaintiff believed at all times that Maye was the owner and landlord of the property, and she had no contact with Jones at any time during the period that she leased the premises. (Glover Dep. 17–18)

Plaintiff alleges that Maye made sexual advances toward her, both before and after she became a tenant. For example, she states that before she signed the lease, Maye told her that he "couldn't wait for her to move in so he could spend more time with her," that he "wanted to make mad passionate love to her." (Glover Dep. 39) Plaintiff claims that she was "disgusted" by these comments, but explains that, "it wasn't to a point where I was scared. I thought at that time he was just—I was a single female, he was looking for a play so I kind of blew him off a lot, but I never felt threatened or intimidated by him." (*Id.* at 38–39) After Plaintiff moved into the apartment, Maye stopped by, uninvited, on several occasions. (*Id.* at 48, 51) Plaintiff alleges that on these occasions, Maye asked for hugs and put his arm around her. (*Id.* at 63–64) Plaintiff further indicates that Maye may have touched her breast on one of these uninvited visits. She also states that, on more than one occasion, Maye pressed his body against

---

1. Jones and Maye are husband and wife, though Plaintiff did not learn this fact until her deposition.

2. During oral argument of the subject motion, Plaintiff's counsel observed, in sum and substance, that, "she [Glover] let him [Maye] do whatever he wanted. There were no rules, no instructions."

3. In their Answer dated May 23, 2005, Jones and Maye admitted the truth of paragraph 5 of Plaintiff's complaint, alleging that "Maye was given authority to rent and manage the property known as 50 Paige Street by defendant Tracey Wynell Jones d/b/a T.W. Jones Development." Additionally, Jones and Maye admitted the truth of paragraph 6 of the complaint, which alleged that Maye was Jones' "agent."

her, and that one time, she could feel that he had an erection. Plaintiff also contends that twice Maye kissed her on the mouth and placed his tongue in her mouth. (*Id.* at 57–63) The last physical contact between Plaintiff and Maye occurred in 2003.

Eventually, Maye stopped visiting the apartment. However, he began driving by the location frequently (Glover Dep. at 48) and calling Plaintiff on the telephone. For example, in January 2003, Maye called Plaintiff repeatedly and asked her to take an out-of-town trip with him. (*Id.* at 55) In February 2003, Maye invited Plaintiff to take a trip with him, and told her that he "had to have her" and wanted to "make her his woman." (*Id.* at 79) Plaintiff declined these invitations and eventually "stopped taking [Maye's] phone calls altogether." (*Id.* at 55) Subsequently, there passed "almost a year" in which Plaintiff and Maye had no conversations or contact of any kind. (Glover Dep. 98)

In or about August 2004, Maye asked Plaintiff to bake him a lemon meringue pie, in exchange for $40. Maye indicates that he did so only because she had told him that she needed money, and that rather than simply giving her the money, he had proposed to pay her for baking the pie. Plaintiff agreed to bake the pie, and accompanied Maye to the store in his truck to buy the ingredients for the pie. (Glover Dep. 94–97) Plaintiff did not feel threatened in Maye's presence or see any problem with baking him a pie, because "so much time had passed" since he had made unwanted advances toward her. (*Id.* at 96) Plaintiff also "knew [that Maye] wouldn't do anything to physically hurt [her]." (*Id.*) Additionally, Plaintiff was "trying to be a little more agreeable" towards Maye, since she knew that she "was coming up for a lease renewal," and wanted "to see where [Maye's] mind was at." (*Id.* at 98)

A few days after Plaintiff baked the pie, Maye telephoned her and asked her to accompany him on an out of town trip, so that he could "make love to [her]." (*Id.* at 99) Plaintiff refused the invitation. Days later, Maye notified Plaintiff that he was increasing her rent $20 per month, from $675 to $695, effective October 1, 2004. However, Plaintiff's lease term did not actually end until October 31, 2004, and Maye states that he meant to indicate that the increase would take effect on November 1st. (*Id.* at 152) In any event, the proposed $20 rent increase was the first in two years.

Plaintiff, who was already behind in paying her August and September rent,[4] could not afford Maye's announced rent increase, and she sent him a letter containing a counter-proposal.[5] When Maye did not respond, Plaintiff sent him a notice on the last day of the rental term, October 31, 2004, indicating that she would vacate the premises in 30 days. (*Id.* at 176) Plaintiff did not pay rent for November, and instead indicated that she wanted Maye to deduct November's rent from her security deposit.

On or about November 15, 2004, Maye and TW Jones Development commenced eviction proceedings against Plaintiff in Rochester City Court. The complaint in the eviction proceeding sought rent for both October and November, in addition to late fees and court costs. On the sched-

---

4. Plaintiff admitted that her rent payments were late in June 2003 and in August and September of 2004, and that she had written several checks to May which had bee returned for insufficient funds. (Glover Dep. 143–148, 150, 159–60)

5. Plaintiff also claims that she sent Maye a check for $695 for October's rent. However, it does not appear that Maye ever collected this amount, since as discussed below, he sought October's rent as part of the eviction proceeding in Rochester City Court.

uled court date, the parties reached a settlement agreement, whereby Defendants agreed that they would keep Plaintiff's security deposit as payment for rent, and Plaintiff agreed that she would vacate the premises on November 26, 2004. Upon the parties' consent, Rochester City Court issued a warrant of eviction, effective November 26, 2007.[6]

Plaintiff commenced the subject action on March 22, 2005, alleging violations of the FHA and NYHRL. Specifically, Plaintiff contends that Maye subjected her to both hostile environment and quid pro quo discrimination. Jones and Maye, then represented by the same attorney, filed an answer to the complaint, which contained no affirmative defenses. (*See*, Docket [# 3]) As already mentioned, however, Jones' and Maye's answer admitted the existence of an agency relationship between them.[7]

On March 12, 2007, Maye filed his summary judgment motion, arguing that: 1) any alleged acts of harassment occurring prior to March 22, 2003 are barred by the statute of limitations; 2) Plaintiff is collaterally estopped from attempting to prove that her eviction was unlawful; and 3) the alleged sexual harassment was not sufficiently severe or pervasive to be actionable. The same day, Jones filed her motion for summary judgment [# 49], claiming that: 1) she cannot be held vicariously liable for Maye's actions under the FHA, because she is an individual, there was no agency relationship between her and Maye, and Maye's actions were

not within the scope of his employment; 2) she cannot be held vicariously liable under the NYHRL, because she did not condone or acquiesce in the alleged harassment; 3) the alleged harassment is either time barred or fails to constitute actionable discrimination; and 4) Plaintiff is barred, by res judicata, from challenging the lawfulness of the eviction. The motions were briefed and counsel appeared before the undersigned for oral argument on July 19, 2007. The Court has thoroughly considered the parties' submissions and the arguments of counsel.

## DISCUSSION

### Summary Judgment Standard

The summary judgment standard is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary

---

**6.** Nevertheless, Plaintiff was still occupying the apartment as of November 30, 2004 when Maye entered the premises to change the locks, although she vacated the apartment at that time.

**7.** Jones and Maye subsequently retained new, separate counsel, and the Court permitted Defendants to amend their answers, for the limited purpose of adding a statute of limita-

tions affirmative defense. (See, Decision and Order [# 42]) At the same time, however, the Court denied Defendants' requests to also add the affirmative defense of collateral estoppel. Nevertheless, the Court held that Defendants could still raise the defense on summary judgment, pursuant to *Curry v. City of Syracuse*, 316 F.3d 324, 330–31 (2d Cir.2003), even though they had not pled the defense in their answers. (*Id.* at 6–7).

judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996)(*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied,* 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *see also,* FED.R.CIV.P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R.CIV.P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

*Sex Discrimination Under the FHA and NYHRL*

 Sexual harassment claims are cognizable under the FHA and the NYHRL. *Rich v. Lubin,* No. 02 Civ. 6786(TPG), 2004 WL 1124662 at *4 (S.D.N.Y. May 20, 2004) ("The FHA prohibits discrimination against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of sex." 42 U.S.C. § 3604(b). Sexual harassment constitutes discrimination in the terms, conditions, or privileges of rental of a dwelling on the basis of sex.") (internal quotation marks omitted); *see also, People of State of N.Y. by Abrams v. Merlino,* 694 F.Supp. 1101,- 1104 (S.D.N.Y.1988) (claims of sexual harassment are actionable under both the FHA and the NYHRL). With regard to hostile environment discrimination,

> [t]he legal standard for sexual harassment claims under the FHA has been analogized in the Second Circuit to the standard pertaining to hostile work environment claims under Title VII. Thus, in order to prevail in a hostile environment sexual harassment claim, [plaintiff] must establish that she was subjected to harassment that was sufficiently pervasive and severe so as to create a hostile environment, and that a basis exists for imputing the allegedly harassing conduct to the defendants.

*Rich v. Lubin,* 2004 WL 1124662 at *4 (citations omitted). *Quid pro quo* harassment, on the other hand, "occurs when housing benefits are explicitly or implicitly conditioned on sexual favors." *Honce v. Vigil,* 1 F.3d 1085, 1089 (10th Cir.1993) (citation omitted).

*Severity of the Alleged Hostile Environment*

 At the outset, Defendants both contend that Maye's alleged actions were

not severe or pervasive enough to be actionable. It is well-settled that "[i]solated or sporadic sexually inappropriate acts are not sufficiently pervasive and severe to constitute sexual harassment under the FHA." *Rich v. Lubin*, 2004 WL 1124662 at *4 (citation omitted). However, "[t]he Second Circuit has cautioned that, because the [relevant] factors require highly fact-sensitive legal determinations, hostile environment cases are not well-suited to disposition on summary judgment unless on the facts alleged no reasonable jurors could differ on the conclusion to be drawn." *Id.* (citation omitted). Here, Plaintiff alleges that Maye verbalized, repeatedly, his desire to have sex with her, kissed her on the mouth and put his tongue in her mouth, hugged her, put his arm around her, and touched her breast. Moreover, as the *de facto* landlord, Maye held a position of power over Plaintiff while he allegedly did these things. These allegations are sufficient to create a triable issue of fact as to whether Maye subjected Plaintiff to a hostile environment. *See, e.g., Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 578 (2d Cir.1989) ("During the two week period in September, described earlier, Peterson was constantly touching Carrero and attempting to bestow unasked for and unacceptable kisses upon her. As Carrero's immediate superior and chief evaluator, he held a position of power over her that, in combination with his unwelcome sexual advances, was tantamount to coercion.... We are satisfied that defendant Peterson's conduct created for appellant a hostile working environment in violation of Title VII.")

### Statute of Limitations

■■■ Alternatively, both Defendants contend that many of the instances of alleged hostile environment harassment are time barred.[8] The Court disagrees, since it is clear that

> in the case of a hostile ... environment claim, the statute of limitations requires that only one sexually harassing act demonstrating the challenged ... environment occur within 300 days of filing; once that is shown, a court and jury may consider "the entire time period of the hostile environment" in determining liability.

*Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir.2004) (*quoting Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). This applies to related acts of harassment that together constitute "the same ... hostile environment claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. at 120–21, 122 S.Ct. at 2076. In this case, the Court finds that there is a triable issue of fact as to whether Maye's actions in August 2004 and his actions in 2002 and 2003 constitute a single hostile environment. If they do, then all of Maye's alleged harassment would be timely under the statute of limitations. Consequently, Defendants' requests for summary judgment based on the statute of limitations are denied.

### Collateral Estoppel/Res Judicata

■■■ Both Defendants also contend that Plaintiff is barred from attempting to prove that her eviction was discriminatory, since the judgment of eviction was purportedly based solely on non-payment of rent. Maye contends that Plaintiff is barred by collateral estoppel, while Jones maintains that Plaintiff is barred by res judicata. Res judicata and collateral estoppel are "related but distinct doctrines [that] operate to prevent parties from contesting matters that they have had a full and fair opportunity to litigate, thereby conserving judicial resources and protect-

---

**8.** Neither defendant contends that the alleged quid pro quo harassment is time-barred.

ing parties from the expense and vexation of multiple lawsuits." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir. 2002) (citation omitted). More specifically,

> [u]nder the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action. It is clear that a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment for res judicata purposes. It is equally well settled, however, that a prior judgment cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case. Likewise, res judicata does not bar subsequent litigation when the court in the prior action could not have awarded the relief requested in the new action.
>
> Whether a claim that was not raised in the previous action could have been raised therein depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first. Also dispositive to a finding of preclusive effect, is whether an independent judgment in a separate proceeding would impair or destroy rights or interests established by the judgment entered in the first action. To determine whether two actions arise from the same transaction or claim, we look to whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.
>
> However, that both suits involved essentially the same course of wrongful conduct is not decisive. For a single course of conduct may give rise to more than a single cause of action for res judicata purposes.

*Id.* at 286–287 (citations and internal quotation marks omitted). Here, the prior action was a proceeding in Rochester City Court, seeking a judgment of eviction and a money judgment for back rent. In a similar situation, the Second Circuit Court of Appeals held that a prior City Court judgment of eviction did not bar the evicted tenant from subsequently bringing a Title VII lawsuit:

> The jurisdiction of city courts is set forth in N.Y. Judiciary Law, Uniform City Court Act §§ 201–213 (McKinney 1984). Under the statute, city courts are courts of limited jurisdiction. Jurisdiction includes, for example, recovery of money up to a stated amount or chattels or summary proceedings to recover possession of real property located within the city limits. The Yonkers City Court plainly lacked jurisdiction to hear a Title VII employment discrimination claim. While Sadore argues that the discrimination allegations were adjudicated as part of the holdover proceeding, nothing in that record indicates the parties submitted any evidence on this issue. The City Court's decision focused primarily on the merits of the holdover proceeding. It found merely that Bottini's discharge was lawful, presumably because Bottini had challenged his eviction by claiming that his discharge from employment was unlawful. Inasmuch as the land lord-tenant city court had limited jurisdiction, it was not a competent or appropriate tribunal to hear Bottini's allegations of religious discrimination against his employer[-landlord]. Since Bottini did not have a full and fair opportunity to litigate his claim in the Yonkers City Court, its judgment should not bar him from bringing his Title VII claim in federal court.

*Bottini v. Sadore Management Corp.,* 764 F.2d 116, 121–122 (2d Cir.1985) (citation omitted). The present case presents almost identical facts. Accordingly, Plaintiff's claim is not barred by res judicata.

 Neither does the Court find that Plaintiff's claim is barred by collateral estoppel. As to that, the doctrine of collateral estoppel is clear:

> Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding. Collateral estoppel applies when: (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Marvel Characters, Inc. v. Simon,* 310 F.3d at 288–289 (citations and internal quotation marks omitted). Here, the issue is whether Maye committed quid pro quo discrimination against Plaintiff by evicting her because she refused his invitation to go on a trip with him. This issue was neither raised nor litigated in the eviction proceeding in Rochester City Court, and consequently Plaintiff's quid pro quo eviction claim is not barred by collateral estoppel. *See, Lachira v. Sutton,* No. 3:05cv1585 (PCD), 2007 WL 1346913 at *15 (D.Conn. May 7, 2007) ("Defendants argue, based on the entry of judgment, that the Housing Court judge necessarily determined that the Stipulated Agreement and anticipated eviction were lawful. This finding does not preclude Plaintiff from now arguing that Defendants' discriminated against her pursuant to the FHA.... Plaintiff seeks ... compensatory and punitive damages, and attorneys' fees and costs. She does not seek to disturb the agreement ... that [the defendant] is entitled to possession of the apartment after June 30,2007. Accordingly, the doctrine of collateral estoppel does not apply.") (footnote and citation omitted).

### *Jones' Vicarious Liability Under the FHA*

 It is clear that under the FHA, owners of real estate may be held vicariously liable for discriminatory acts by their agents and employees. *Jankowski Lee & Assocs. v. Cisneros,* 91 F.3d 891, 896 (7th Cir.1996) (citations omitted). In this regard, the Second Circuit has stated that,

> [i]n order to avoid predicating liability for Title VIII of the Civil Rights Act of 1968 violations on the vagaries of state law, the question whether an agency relationship exists for purposes of the Fair Housing Act is determined under federal law. Agency is a legal concept that depends on the existence of three elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking. The question whether an agency relationship exists is highly factual, however, and can turn on a number of factors, including: the situation of the parties, their relations to one another, and the business in which they are engaged; the general usages of the business in question and the purported principal's business methods; the nature of the subject matters and the circumstances under which the business is done.

*Cleveland v. Caplaw Enter.,* 448 F.3d 518, 522 (2d Cir.2006) (citations and internal quotation marks omitted).

 Jones contends that she cannot be held vicariously liable under the FHA because she is an individual. In support of

this argument, Jones relies on *Meyer v. Holley*, 537 U.S. 280, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003) and *Cleveland v. Bisuito d/b/a Caplaw Enters.*, No. 03–CV–6334 CJS(F), 2004 WL 2966927 (W.D.N.Y. Dec.21, 2004). However, these cases are inapposite. For example, in *Meyer v. Holley*, the U.S. Supreme Court held that under the FHA, an employer or principal may be held vicariously liable in accordance with traditional agency principles, and that ordinarily, it is a corporation, and not its individual officers, which is the employer or principal. *Id.*, 537 U.S. at 282, 123 S.Ct. at 827. The court did not say that individuals cannot be held liable under the FHA. Similarly, in *Cleveland v. Bisuito*, the plaintiffs sued Charles Bisuito, who was a partner in Caplaw Enterprises, which owned the rental property at issue in that case. This Court granted summary judgment to Bisuito, finding that the partnership was the correct defendant. *Cleveland v. Bisuito d/b/a Caplaw Enterprises*, 2004 WL 2966927 at *7. This Court did not hold that an individual such as Bisuito could never be sued under the FHA, but rather, it merely found that Bisuito was not the owner of the property. Here, on the other hand, Jones is the owner of the property, even though she does business under the assumed name "T.W. Jones Development." As such, she may be held personally liable. *In re Golden Distributors, Ltd.*, 134 B.R. 766, 769 (Bkrtcy.S.D.N.Y.1991) ("The designation 'd/b/a' means 'doing business as' but is merely descriptive of the person or corporation who does business under some other name. Doing business under another name does not create an entity [separate] from the person operating the business. The individual who does business as a sole proprietor under one or several names remains one person, personally liable for all his obligations.") (citation omitted). Consequently, Jones may be sued individually under the FHA.

Jones further maintains that she cannot be held vicariously liable, because there was no agency relationship between herself and Maye, and because Maye was not acting within the scope of his employment. However, contrary to this first contention, Jones admitted in her original answer to the complaint that Maye was her agent. *See, Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir.2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation.") (citations omitted). As to Jones' second contention, it is clear that "an employer may be held liable for the actions of an employee even when they are outside the scope of employment. Such liability may arise, for example, if the employee was aided in accomplishing the tort by the existence of the agency relation." *Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir.2003) (citations omitted). Here, Plaintiff alleges that Maye used his position as the de facto landlord to perpetrate FHA violations against her. For example, Maye's position gave him the opportunity to visit the apartment when he wanted, and enabled him to control Plaintiff's rent. *See, Richards v. Bono*, No. 5:04CV484–OC–10GRJ, 2005 WL 1065141 at *7 (M.D.Fla. May 2, 2005) ("Several of the acts of sexual harassment were facilitated by Mr. Bono's capacity [as] owner, property manager, and maintenance supervisor, i.e., he used his key to enter the Plaintiff's residence, sometimes under the guise of making repairs. He also threatened to exercise his power to evict the Plaintiff. As such, his capacity as owner and as Mrs. Bono's agent aided in the perpetration of his unlawful conduct."). The Court finds, therefore, that there are triable issues of fact concerning Jones' vicarious liability under the FHA.

Finally, Jones maintains that she cannot be held vicariously liable for punitive damages under the FHA. In this regard, Jones cites *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) for the proposition that "a principal cannot be held liable for punitive damages when the person makes a good-faith effort to prevent discrimination." (Jones Memo p. 17). Jones' misunderstands the holding in *Kolstad,* however. In *Kolstad,* the Supreme Court held that vicarious liability for punitive damages under Title VII is governed by the principles set forth in the Restatement (Second) of Agency § 217C, which are as follows:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:
>
> (a) the principal authorized the doing and the manner of the act, or
>
> (b) the agent was unfit and the principal was reckless in employing him, or
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> (d) the principal or a managerial agent of the principal ratified or approved the act.

*Kolstad v. American Dental Ass'n,* 527 U.S. at 542–543, 119 S.Ct. at 2128. The court modified subsection (c) above, however, by adding that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Id.,* 527 U.S. at 545, 119 S.Ct. at 2129 (citation omitted). The *Kolstad* decision thus created an affirmative defense, which "requires an employer to establish both that it had an antidiscrimination policy and made good faith effort to enforce it." *Zimmermann v. Associates First Capital Corp.,* 251 F.3d 376, 385 (2d Cir.2001). Jones has made

neither showing. To the contrary, Jones indicated at her deposition that T.W. Jones Development had no personnel policies or written employment guidelines. (Jones Dep. 21). Therefore, Jones' motion for summary judgment on Plaintiff's FHA punitive damages claim must be denied.

*Jones' Vicarious Liability Under the NYHRL*

Vicarious liability under the NYHRL is determined quite differently than under the FHA: "Under New York law, in order to recover against an [owner], the complainant must demonstrate that the [owner] acquiesced in the discriminatory conduct or subsequently condoned it." *Father Belle Community Ctr. v. New York State Div. of Human Rights on Complaint of King,* 221 A.D.2d 44, 53, 642 N.Y.S.2d 739, 746 (4th Dept.1996); *Vitale v. Rosina Food Prods. Inc.,* 283 A.D.2d 141, 143, 727 N.Y.S.2d 215, 217–218 (4th Dept.2001) ("In order to hold a defendant liable under New York law for alleged pervasive harassment, a plaintiff must prove that the employer had knowledge of and acquiesced in the discriminatory conduct of its employee.") (citations and internal quotation marks omitted); *Heskin v. Insite Adver., Inc.,* No. 03 Civ.2508 GBD AJP, 2005 WL 407646 at *23 (S.D.N.Y. Feb.22, 2005) ("Under § 296 of the NYSHRL ... an employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.") (citations and internal quotation marks omitted); *but see, e.g., Perks v. Town of Huntington,* 251 F.Supp.2d 1143, 1159 (E.D.N.Y.2003) (Applying Title VII standard for vicarious liability to NYHRL claims.) In this case, there is no indication that Jones acquiesced in Maye's alleged conduct, or that she subsequently condoned it. Accordingly, the Court agrees that Jones is entitled

to summary judgment on the NYHRL claim.

## CONCLUSION

For all of the foregoing reasons, Maye's motion [# 45] for summary judgment is denied in its entirety, and Jones's motion [# 49] for the same relief is granted in part and denied in part. Jones is granted judgment on Plaintiff's NYHRL claims, and her motion is otherwise denied.

So Ordered.